IONMAR COMPANIA NAVIERA, S.A., as Owner of the Motorship NICOLAOS, D.L.

v.

CENTRAL OF GEORGIA RAILROAD COMPANY, Georgia Ports Authority, Smith & Kelly Company, Olin Corporation and Southern Railway Company.

CLIMATROL INDUSTRIES, INC., et al.,

v.

M/V NICOLAOS, D.L., her engines, boilers, etc., Ionmar Compania Naviera, S.A., New Zealand Shipping Co., Ltd., Central of Georgia Railway, Georgia Ports Authority, Smith & Kelly Co., Olin Corporation and Southern Railway Company.

CONSOLIDATED BEARINGS CO. PTY., LTD. et al.,

v.

M/V NICOLAOS D.L., her engines, boilers, etc., and Ionmar Compania Naviera, S.A.,

v.

CENTRAL OF GEORGIA RAILROAD COMPANY, Southern Railway Co., Georgia Ports Authority, Smith & Kelly Co., and Olin Corporation.

Civ. A. Nos. 3039, 474–130 and 474–131.

United States District Court, S. D. Georgia.

May 25, 1979.

**944**

David Wood, Hill, Betts & Nash, New York City, George H. Chamlee, Chamlee, Dubus & Sipple, Savannah, Ga., for Ionmar Compania Naviera, S.A. and M/V Nicolaos, D.L., et al.

James F. Hart, Bigham, Englar, Jones & Houston, New York City, Edwin D. Robb, Jr., Bouhan, Williams & Levy, Savannah, Ga., for Climatrol Industries, Inc.

Martin B. Mulroy, Caspar E. Ewig, Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, Fred S. Clark, Lee & Clark, Savannah, Ga., for Consolidated Bearing Co. Pty., Ltd.

Stanley M. Karsman, Marshall R. Wood, Savannah, Ga., for Smith & Kelly, Co.

Spencer Connerat, Jr., Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, Savannah, Ga., for Georgia Ports Authority.

Sewell K. Loggins, Gambrell, Russell, Killorin, Wade & Forbes, Atlanta, Ga., Edward T. Brennan, Jr., Adams, Adams, Brennan & Gardner, Savannah, Ga., for Olin Corp.

John B. Miller, Miller, Simpson & Tatum, Savannah, Ga., for Central of Georgia, R. Co., and Southern Ry. Co.

OPINION

, LAWRENCE, Senior District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON LIABILITY

#### I.

*Background of Litigation*

These cases involve claims totaling around $4,000,000 in alleged damages to the cargo and to the M/V *Nicolaos* growing out of a fire aboard the vessel at Savannah on March 14, 1970. Admiralty jurisdiction is based on 28 U.S.C. § 1333 and Rule 9(h), F.R.Civ.P.

The three actions were consolidated for the purpose of trial. The suits grow out of a fire that erupted in the hold of the *Nicolaos* at the Ocean Terminal of Georgia Ports Authority on the date referred to. The vessel docked there on March 11, 1970, this port being her last stop in the United States before departing for Australia. On March 14th the *Nicolaos* took on a cargo of HTH, a powerful oxidizing agent produced by Olin Corporation and marketed under that brand name.[1] It is extensively used in the cleaning of swimming pools.

The stowage was completed by the longshoremen on the early evening of March

---

1. HTH is an unstable white granular substance. It is an oxidizing material that "yields oxygen readily to stimulate the combustion of organic matter" (46 C.F.R. § 146.22–1) and contains 70% chlorine and 30% inert ingredients. HTH is capable of producing very high temperatures by coming into contact with organic material.

14th. The shoring gang which braces the cargo in the holds worked until 10:00 P.M. at which time they finished their job. The ship was prepared to leave Savannah later that night.

About 10:45 P.M. a fire broke out in the No. 3 tween deck hold when the *Nicolaos* was still berthed at the Terminal. It raged for several hours before being brought under control after the Master ordered the flooding of the hold in which the fire was centered as well as the compartment below. As the result of the fire, water, heat and smoke, considerable damage was done to the vessel and the shipments of 96 different cargo owners.

The shipowner, Ionmar Compania Naviera, S.A., filed the first of the three consolidated actions. The defendants were Central of Georgia Railroad Company, Southern Railway Company,[2] Smith & Kelly, Georgia Ports Authority, and Olin Corporation.

Climatrol Industries, Inc. and Consolidated Bearings Co., representing numerous cargo interests, subsequently filed actions against the same defendants and the vessel and shipowner.[3] See No. 474–130.

In No. 474–131 the cargo owners represented by Consolidated Bearings Co. sued only the ship and her owner which brought a third party action against Olin Corporation, Georgia Ports Authority and Smith & Kelly.

The defendants in the suits are Olin Corporation, Georgia Ports Authority (which operates the docking facilities and the terminal), Smith & Kelly Company (the stevedore which loaded the cargo at Savannah) and Central of Georgia Railroad Company and Southern Railway Company (which transported the goods by rail from Olin's plant at Charleston, Tennessee).

The consolidated cases were tried solely on the issue of liability without a jury on April 12–16; July 13–16; and December 6–10, 1976.

The record in the litigation approximates 7,500 pages. Approximately 200 hours have been spent by the Court in the preparation of findings of fact and conclusions of law in these cases.

## II.

### *The Contentions of the Parties and the Issues*

The major issues in this litigation are: What was the origin and cause of the fire and whose negligence, if any, caused it?

Plaintiffs submit three alternative theories as to the cause. First, they hypothesize that the heat from an external source in the hold of the ship heated the calcium hypochlorite and caused the chemical to undergo *spontaneous* combustion. Secondly, they suggest that an organic contaminant was introduced into one or more of the drums during filling at Olin's plant. Thirdly, plaintiffs contend that HTH was spilled in the hold and came into contact with some organic matter[4] causing a rapid decomposition which produced intense heat that ignited two hundred eighty-six 55 gallon HTH drums stowed in No. 3 tween deck hold.

The claims of negligence against the various defendants are as follows:

### *As to Olin Corporation*

It is claimed that Olin was negligent in manufacturing the calcium hypochlorite to proper standards as a result of which the cargo was unstable when delivered to the *Nicolaos*; in packing same improperly in containers not adequate for the purpose, and in failing to give sufficient warning to the parties in the chain of delivery as to the propensities of the cargo and the necessity

---

2. At the conclusion of the trial, the case against the two Railroads was dismissed by the Court without objection by plaintiffs.

3. The aggregate of the damage claims of the ninety-six cargo owners who are plaintiffs in CV474–130 and CV474–131 is $3,104,594.90.

The owner of the *Nicolaos* alleges that the damages to the vessel and expenses incidental to the fire are "in the sum of about $1,000,000."

4. Organic matter is that which is derived from living organisms (vegetable or animal).

of special handling. It is further contended by the plaintiffs that Olin was negligent in its packaging of HTH by failing to give adequate warning thereon of attendant dangers. Plaintiff cargo owners also claim liability on Olin's part under the strict products liability doctrine.

### As to Georgia Ports Authority

It is alleged that GPA was negligent in its method of removing the drums from the freight car; in improperly stacking same; in failing to inspect the drums and segregating those damaged, and in failing to follow the manufacturer's recommendations as to the proper handling of HTH. Plaintiffs also assert that Georgia Ports Authority was negligent in failing to discover or remove a leaking drum from the shipment.

### As to Smith & Kelly

It is alleged that the stevedore was negligent in transporting the drums from where they were stored by Georgia Ports Authority to the vessel; in handling the drums contrary to instructions by the manufacturer as to the proper method; in hoisting drums aboard the vessel and in stacking same in the tween deck hold one on top of the other; in failing to inspect the condition of the lids; in not adopting the safer method of deck stowage of the HTH; in improperly erecting the fencing in the hold; in failing to perform services in a proper workmanlike manner, and in stowing a leaking drum or in spilling HTH in the hold where it was stowed.

### As to the Shipowner

It is alleged that Ionmar Compania Naviera S.A., the shipowner, maintained an unseaworthy vessel and that such condition was a proximate cause of damage to the merchandise. Unseaworthiness is also claimed by reason of negligent stowage and an improperly trained fire-fighting crew.

### Contentions of the Defendants

Smith & Kelly and Georgia Ports Authority each denies any negligence on its part and contends that the negligence, if any, that caused the fire was that of the vessel or of another defendant. GPA claims that after releasing the drums of HTH to the stevedore it had no further responsibility as to the cargo. Smith & Kelly argues that the stowage was performed under the control and supervision of the vessel and that any negligence is attributable to the shipowner.

Olin denies negligence on its part and contends that the vessel assumed the risk of transporting calcium hypochlorite. It says that any negligence involved was that of another party. Olin claims that the cause of the fire is unknown and that there is no reasonable basis for a finding of liability as to anyone.

### III.

### Subsidiary Findings of Fact

1. The *Nicolaos* is a Greek flag vessel which was built in England in 1969. Her gross tonnage is 9,038.

2. The vessel arrived in Savannah on March 11, 1970 in order to take on cargo for a continuation of her voyage to Australia. She had previously done so at St. Johns, New York, Philadelphia, and Newport News.

3. The cargo taken on at Savannah was loaded in several of the five holds, including the No. 3 tween deck. Shipments there stowed included a tractor and tractor parts, cellulose film, newsprint, and some chemicals.

4. Also loaded at Savannah in the No. 3 tween deck were 286 fifty-five gallon drums of Olin's HTH which were stowed near the center of the square of the hatch.

5. The stowage plan was approved by Joseph L. Harwell, maritime surveyor for the National Cargo Bureau, a non-profit

organization.[5] Harwell and H. M. Carter, Jr., stevedore foreman for Smith & Kelly, inspected the stow during and after the loading.

6. Loading of the drums was completed at 5:00 P.M. on the 14th. Shoring of the drums and other work continued until 10:00 P.M.

7. About 10:30 Chief Officer Floratos made a thorough inspection preparatory to closing the hatch covers. Everything appeared in order. He saw no leaking cargo.

8. The McGregor hatch cover was put in place. Before the port side could be "seated," the Chief Officer shouted "Fire." Floratos had noticed a deep red glow through the crack between the hatch cover and the coaming.

9. Third Officer Despiris observed a red orange glow in the center of the hatch. Carpenter Ladas who was standing with one foot on the hatch cover noticed white smoke coming through the "unseated" port side of the hatch cover. While he was watching, the hatch cover on which he was standing rose suddenly and knocked him to the deck.

10. Mr. Carter, the stevedore foreman who was just leaving the ship, furnishes a graphic account. He testified:

"a heavy white smoke or vapor. . . . It was at the after port corner of the hatch between the McGregor and the hatch combing [coaming]. . . . It was running right up the hatch and curling down over the deck. . . .

"To me it wasn't an explosion, Your Honor. It said, "poof," but then it went right from that "poof" right into a howling shrieking jet engine or blow torch. . .

"You had your debris flying up in the air, like snow flakes. Somebody used the term popcorn. Snow flakes or popcorn." Tr. 4, pp. 177–79.

11. The Walter Kidde smoke detection system was in proper working order. However, it did not set off the alarm until after the fire was observed by Carter and members of the crew.

12. Mr. Carter ran and called the Savannah Fire Department and the Captain of the Port. It was logged at 10:49 A.M. The ship's crew had immediately begun to fight the fire. By the time the Fire Department from Savannah arrived at 10:52, the crew was putting water on the fire with the ship's hoses.

13. The fire was not extinguished until the next morning when the number 2 and 3 tween decks were flooded.

14. Plaintiffs contend that the fire was started by Olin's shipment of HTH, calcium hypochlorite. Calcium hypochlorite is an unstable, white, granular substance. It is an oxidizing material "that yields oxygen readily to stimulate the combustion of organic matter" (46 C.F.R. § 146.22–1), capable of producing very high temperatures by contact with organic material.

15. The drums of HTH were marked on the side with yellow diamond-shaped labels required to be placed by the Coast Guard Regulations on all containers of oxidizing agents. 46 C.F.R. § 146.05–17(g).

16. The label reads, "Keep Away from Fire, Heat, and Openflame Lights CAU-

---

**5.** "(a) The National Cargo Bureau, Inc. is authorized to assist the United States Coast Guard in administering the provisions of the Dangerous Cargo Act . . . and the regulations in this subchapter with respect to:

(1) Inspection of vessels for suitability for loading dangerous cargo;

(2) Examination of stowage of dangerous cargo;

(3) Making recommendations as to stowage requirements of dangerous cargo; and

(4) Issuance of certificates of loading setting forth that the stowage of dangerous cargo is in .

accordance with the regulations in this subchapter.

(b) Certificates of loading of the National Cargo Bureau, Inc. may be accepted as prima facie evidence of compliance with the Dangerous Cargo Act . . . and the regulations in this subchapter." 46 C.F.R. § 146.02–6a. (N.B. All references to C.F.R. are to the Regulations in effect at the time of the fire). The Act authorizes the Coast Guard to promulgate regulations. 46 U.S.C. § 170(7)(a).

TION Remove Carefully the Contents of Broken Packages DO NOT DROP." [6]

17. An additional label on the top of the drum was designed for the ultimate consumer. It was not intended to warn those in the chain of transportation. Nowhere on any of the drums did the name "calcium hypochlorite" appear.

18. Olin did not furnish any specialized handling instructions to the vessel, the Ports Authority, or to Smith & Kelly.

19. Gordon W. Rousseau, Olin's expert on dangerous cargo labeling, explained that the Government's labeling requirements had been simplified to communicate basic hazards to those handling the cargo. The system is based on differently colored diamond-shaped labels.[7] There are numerous dangerous products, and it would be counter-productive to have a different label for each. Different types of dangers may be represented by the same color label.

20. According to Mr. Rousseau, when a longshoreman sees a yellow label cargo, "I would expect him to do whatever he is doing. I then expect him to warn other people in the area if there's been a spillage. I then expect him to seek help from supervisory personnel, be they ship personnel or waterfront personnel." Tr. 12, p. 56. He conceded on cross-examination that a shipper could place additional handling information on the containers or on bills of lading. However, Mr. Rousseau added "that when a shipper starts describing hazards of products, using other words such as toxic, explo-

sive, what have you, he runs a risk of confusing persons." Tr. 12, 81.

21. Calcium hypochlorite possesses two characteristics not common to most other oxidizing agents. First, if external heat of 350° F. is applied, calcium hypochlorite will continue to decompose rapidly and spontaneously even after the external heat source is removed. Secondly, if it comes in contact with organic material, calcium hypochlorite will undergo a violent decomposition.

22. Because it is an oxidizing agent, the chemical gives off oxygen during decomposition which sustains further decomposition. The release of oxygen increases the temperature of the combustion. Dr. Reginald Milton of London who testified as an expert for plaintiffs said that in the case of a hypochlorite fire, "you don't have to rely on outside air because the hypochlorite supplies the oxygen in large quantities and very rapidly, and at a high temperature, so that there is a very, very intense fire." [8] Tr. 5, 264–65.

23. When calcium hypochlorite was added to saw dust similar to what may have been left in the tween deck, Dr. Milton recorded a 39° centigrade rise in temperature in 20 minutes in a small flask. With larger amounts in an experiment conducted outside in 16° weather, "after three minutes the temperature had gone up to thirty-eight degrees centigrade. After ten minutes it had gone up to seventy degrees centigrade. In fifteen minutes it was pro-

---

**6.**

**7.** A red label indicates inflammable liquids. A yellow label indicates inflammable solids or ox-

idizing materials. A white label indicates acids. 46 C.F.R. §§ 146.05–17(f), (g), and (h). The British rules as to the labelling of dangerous goods call for a stencil which indicates the nature of the danger to which the goods give rise. See James Wang, K.K., 8 *J. Maritime L.* (April 1977) 387, 396.

**8.** Dr. Reginald Milton holds a Ph.D. from London University and is a Fellow of the Royal Institute of Chemistry. He has been a consulting chemist since 1937. For the past twenty-five years his firm has specialized in problems in the shipping industry including investigations of fires and explosions and advice on the carriage of dangerous cargo. He had personally investigated five fires aboard vessels involving calcium hypochlorite. Tr. 3, 243–47.

ducing fumes and the mass was beginning to char. . . ."

24. On the basis of his experiments this expert concluded:

"If we assume that there was sawdust, and if we assume that there was calcium hypochlorite and they got mixed together and if we accept the results of my experiment, there's a possibility that there could be quite an intense fire. Now, if that fire, it might be only a small fire, but if it was in close contact with the metal of a drum, it could heat the hypochlorite at the other side of the metal, to the point of self-sustained propagation [sic] and up would go the drum. . . . Blow the contents out, blow the boiling hypochlorite all over the place, and would produce enough heat to set off a reaction to cause all the others to go."

25. John F. Connell is a former fire investigator for New York City and is President of a fire investigation consulting firm. He had investigated approximately twenty fires started intentionally or accidentally by calcium hypochlorite. Mr. Connell had conducted several experiments with HTH and various organic substances. He concluded that the fire aboard the *Nicolaos* originated in the cargo of HTH as a result of spillage. Mr. Connell testified that his tests were made under similar circumstances and that they were consistent with the eyewitness testimony, particularly that of the stevedore foreman, Carter.

26. Frank Rushbrook, a fire consultant from Edinburgh, concluded that the fire started in the HTH and that it was caused by spillage. Dr. Edward E. Mercer, a professor of chemistry at the University of South Carolina, was also of the opinion that the spillage theory constituted the most probable cause of the fire.

27. The tests are inconsistent with the rogue drum theory.[9] They demonstrate that if a contaminant is present inside a drum, the first sign of trouble is an explosion rather than smoke or the red glow. While the testimony of Chief Officer Floratas supports the rogue drum theory, the evidence indicates that spillage of HTH came into contact with organic material in the hold.[10]

28. Olin was aware that HTH and brands of other producers of calcium hypochlorite had caused fires aboard other vessels.

29. Olin manufactures about two-thirds of the calcium hypochlorite produced in the United States—a hundred million pounds, according to Dr. Faust. It began to manufacture the product in question in 1928. HTH is produced at Olin's plant in Tennessee which plaintiffs' experts visited. They agreed that the manufacturing process itself was well-controlled.

30. However, according to them, the loading process was deficient. The drums were filled in a dusty environment and there was only minimal inspection of containers before filling. It would be possible for a contaminant to be introduced into a drum during the process which could result in a "rogue drum," that is, one which will violently decompose for no apparent reason.

31. In 1967 Olin began using 55 gallon, 423 pound drums, rather than 100 pound drums for overseas shipment of HTH.

32. On March 4, 1970 a shipment of 287 drums was sent by rail from the Tennessee

9. Counsel for Climatrol state in their post-trial brief that "Presumably the vagaries of a rogue drum, in the minds of our London experts, are akin to those of a rogue elephant."

10. Another shipment of calcium hypochlorite, consisting of 1,120 100 pound drums, was stowed in a different hold and was not damaged in the fire. They were off-loaded and then re-stowed on deck following an individual inspection of each drum. The deck stow was covered by a tarpaulin for protection from the elements. Over the objection of hearsay and relevancy by Olin's counsel, Chief Officer Floratas testified that while the *Nicolaos* was docked in Sydney one of these drums exploded for no apparent reason and was thrown overboard by the crew. The last opportunity for contamination of the particular drum was during reloading in Savannah. The voyage to Sydney lasted around forty days. This testimony was introduced by plaintiffs to prove that "rogue" drums were possible and that delay from contamination to the time of explosion could be of extended duration.

**950**

plant to the Georgia Ports facility. The car was sealed by Olin. It was broken by Richard C. Robinson of GPA when it arrived at the Georgia Ports Authority facility on March 11th. Mr. Robinson was in charge of the unloading.

33. One of the drums in this shipment, number 220, was set aside by GPA because it was leaking. There is conflicting testimony concerning the damage to the drum number 220.[11]

34. Edgar Wingster, a laborer for GPA, helped unload the car. He noticed only one leaking drum. It had a nail hole just below the middle rim. He called the leaking drum to the attention of Mr. Robinson. Shown a photograph of drum 220, Wingster testified that "it's not that drum, I'm goin' guarantee you." Tr. 4, 10.

35. Mr. Robinson said that only one leaking drum was reported to him. It had a gash 8–10 inches long and 1½ inches wide. That drum, number 220, was set aside. However, when shown a photograph of drum 220, he said, "I didn't see this damage." Tr. 4, 43.

36. James B. Rollinson who is Assistant Superintendent of the Authority's Ocean Terminal also saw the damaged drum. He recalled that the hole was 3 to 4 inches long. The drum was number 220. However, he testified that the photograph of 220 did not look like the drum he saw. Tr. 3, 152–53.

37. The drums were removed from the rail car and placed on the dock along a covered warehouse margin. One drum (number 220) was set aside and was not loaded on the *Nicolaos.*

38. Although testimony as to the nature of the damage to drum 220 is conflicting, the witnesses concurred that only one drum was damaged and that it was removed from the shipment.

39. Mr. Rollinson stated that "The Georgia Ports Authority employs their own laborers, and our responsibility is to discharge the rail cars or trucks. . . . We put it on the dock, on the terminal—what we re-fer to as a point of rest. . . . Our responsibility at that point ends. The steamship agent for the Line, whoever, picks it up from that point." Tr. 3, 160–61.

40. Mr. Rollinson testified that when he saw a yellow label on the cargo, he realized that the cargo should be treated "a little more careful than a bag of clay." Tr. 3, 175. When he was dealing with dangerous cargo, he occasionally received special handling instructions from the shipper. He received no such instructions from Olin. He did not know that there could be danger if HTH spilled and gave no special instructions regarding cleaning up spilled material in this instance.

41. On March 14, 1970 the 286 drums of HTH were moved shipside on forklifts operated by Smith & Kelly employees. Willie Jackson was one of the tie-on men. He secured the drums to pallets which were then placed in the hold by a Georgia Ports Authority gantry crane. He testified: "Mr. Carter he did always tell us if we find any damaged drums to set it off and let him inspect it before we send it into the hold. On that day, I did not remember findin' any damaged ones." Tr. 3, 5. Jackson did find about two drums with loose lids. He tightened the screw with his fingers and let the drums go aboard.

42. In the hold there was an eight man gang of longshoremen and a flagman under the header named Morrison Lawyer. A double layer of dunnage was placed first, then the cargo was placed in the hold. Mr. Lawyer testified that Carter "told me that they were yellow label drums, and that to handle it real careful, not to drop them. . . ." Tr. 2, 19. The drums were rolled on their chines into position in the hold. They were stacked two high.

43. Longshoreman Lawyer saw no leaking drums. None of the longshoremen reported any leakage to him.. Generally, if a lid were loose, one of the men would tighten it and stow the drum. He did not recall seeing any loose lids but did notice a chlorine smell in the hold.

11. Counsel for Georgia Ports Authority conceded that "We cannot reconcile this testimony as to that one drum."

44. Willie Reynolds was one of the long-shoremen in Lawyer's gang. He testified that they started coughing and sneezing when the drums were brought on board. He also testified that he saw a white granular substance that looked like detergent on one of the pallets. It was in a pile two to three inches in diameter and one inch high. The material was not cleaned up. It may have fallen into the hold off the pallets when they were removed from the ship.

45. Lawyer testified that no one reported seeing any material outside the drums although "There might have been a little [clay] dust on the pallet, I wouldn't be for sure." Tr. 2, 58.

46. Mr. Lawyer testified that if any material had been spilled, it would have been cleaned up and taken out of the hold in accordance with general instructions and practice. "[I]f we waste anything like that, we are instructed to clean it up and we send it back out the ship, but in this case we didn't have nothing like that happen." Tr. 2, 65.

47. The stevedore shoring gang went aboard the vessel about 7:00 P.M. A fence of new pine lumber was constructed around the drums. The lumber was sawed in the hold near the cargo of HTH. The operation was completed around 10:00 P.M. about 45 minutes before the fire erupted.

48. Stevedore Foreman Harry Carter and Chief Officer Floratas inspected the hold after the shoring gang left. Neither saw anything out of the ordinary.

49. Plaintiffs advance several theories on the presence of loose HTH in the hold. A broached drum may have been loaded on the *Nicolaos.* HTH from drum number 220 which was not loaded may have spilled on other drums in the railroad car and not

been cleaned up. Or the hypochlorite may have been spilled from a drum with a loose lid when the cargo was being placed in the hold.

50. Two or three ounces of HTH in contact with an equal amount of sawdust would be sufficient to start the fire.

51. In 1970 little was known about the properties of calcium hypochlorite by those other than the manufacturers. The only information available to the Ports Authority and Smith & Kelly was contained in C.F.R. The only indication in the Regulations that calcium hypochlorite could itself start a fire appears to be incorrect.[12]

52. The ship's fire equipment, including the smoke detection system, was in good order and the crew quickly and diligently reacted to the emergency.

IV.

*Relevant Principles of Law*

(A)

1. Federal regulations permit stowage of calcium hypochlorite "On deck protected," "On deck undercover," "Tween decks," or "Underdeck, but not overstowed." 46 C.F.R. § 146.22–200.

2. Both the Fire Statute[13] and the Carriage of Goods by Sea Act[14] are applicable in this case.

3. Under the former, " 'neglect of the owner' means his personal negligence, or in case of a corporate owner, negligence of its managing officers and agents as distinguished from that of the master or subordinates . . .." *Consumers Import Co. v. Kabushiki Kaisha Kawasaki Zosenjo,* 320 U.S. 249, 252, 64 S.Ct. 15, 16, 88 L.Ed. 30. See also *A/S J. Ludwig Mowinckels Rederi v. Accinanto, Limited,* 199 F.2d 134

---

12. "The vapors from ruptured containers have been known to ignite spontaneously," according to 46 C.F.R. § 146.22–200.

13. "No owner of any vessel shall be liable to answer for or make good to any person any loss or damage . . . by reason or by means of any fire . . . unless such fire is caused by the design or neglect of such owner." 46 U.S.C. § 182.

14. "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

. . . . .

(b) Fire, unless caused by the actual fault or privity of the carrier." 46 U.S.C. § 1304(2)(b).

(4th Cir.), cert. den. 345 U.S. 992, 73 S.Ct. 1129, 97 L.Ed. 1400.

■ 4. The terms "actual fault or privity" under COGSA and "design or neglect" under the Fire Statute have the same meaning. *Asbestos Corp. Limited v. Campagnie De Navigation Fraissient et Cyprien Fabre,* 345 F.Supp. 814 (S.D., N.Y.).

■ 5. The burden rests on the cargo claimants to establish that the fire resulted from the personal fault and neglect of the vessel owner. *Hanson, Orth, Inc. v. M/V Jalatarang,* 450 F.Supp. 528 (S.D., Ga.); *American Tobacco Company v. Goulandris,* 173 F.Supp. 140, 178 (S.D., N.Y.), aff'd 281 F.2d 179 (2nd Cir.); *Fidelity-Phenix Fire Ins. Co. of New York v. Flota Mercante del Estado,* 205 F.2d 886 (5th Cir.), cert. den. 346 U.S. 915, 74 S.Ct. 275, 98 L.Ed. 411.

6. The recent decision of the Ninth Circuit in *Sunkist Growers, Inc. v. Adelaide Shipping Lines, Ltd.,* No. 76–3112 (March 8, 1979) contains a full analysis of the Fire Statute and the COGSA exemption. After a review of the history of the exemptions and the precedents, the Court concluded that COGSA prescribes an overriding obligation on the part of the shipowner to make the ship seaworthy and to properly man, equip, and supply the vessel. If that obligation is not fulfilled and such failure causes damage the fire exemptions cannot be relied upon. The Ninth Circuit's view of the statute requires that the shipowner establish due diligence on his part to make the vessel seaworthy before the COGSA exemption can be relied on.

■ 7. In a fire case, negligent stowage by the stevedore is not attributable to the vessel owner. *A/S J. Ludwig Mowinckels Rederi v. Accinanto, Limited, supra,* 199 F.2d 134.

(B)

■ 8. Under admiralty law, "the seller of a product is only under a duty to warn of those dangers which are reasonably foresee-

able and of which the plaintiff cannot reasonably be expected to be aware. [Cits.] The seller or supplier must exercise reasonable care to inform those who may use or come into contact with the product of its dangerous propensities." *Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968, 977 (5th Cir.).

9. "A supplier of a chattel is under the duty to inform those expected to use the equipment of facts which make it likely to become dangerous." *Reddick v. White Consolidated Industries, Inc.,* 295 F.Supp. 243, 245 (S.D., Ga.).

10. "[U]nder maritime common law in the United States a cargo owner is under the obligation of informing a carrier of inherent dangers in the cargo of which the cargo owner is aware or ought to be aware and of which the carrier is not aware and cannot reasonably be expected to be aware." *Sucrest Corporation v. M/V Jennifer,* 455 F.Supp. 371 (D.Me.). "[W]hen a failure to give adequate warning is alleged to have made a product unreasonably dangerous, the standard for strict liability is essentially similar to the standard for establishing negligence; the seller or manufacturer has a duty to warn of foreseeable dangers." *Borel v. Fibreboard Paper Products Corporation,* 493 F.2d 1076, 1093 (5th Cir.), cert. den. 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107.

(C)

■ 11. In *Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Company,* 565 F.2d 1129 the Ninth Circuit said: "We hold that strict products liability actions have become sufficiently well-established to justify its being incorporated into the law of admiralty." That case involved a fire aboard a vessel as a result of which she ultimately sank. The decision cites the precedents supporting the rule that strict liability applies in admiralty. They include holdings of the Seventh and Eighth Circuits to that effect. 565 F.2d 1184–1135.[15]

---

15. The Fifth Circuit has avoided at least three times a ruling on the issue and has not yet

decided it. *Williams v. Brasea, Inc.,* 497 F.2d 67, 78; *Higginbotham v. Mobil Oil Corporation,*

12. It has been said that the strict liability doctrine may require a manufacturer to use reasonable efforts to bring the warning to the attention of the potential user. The seriousness of the consequences of an accident bears on the duty and scope and degree of intensity of the warning and every reasonable precaution suggested by experience in the attendant dangers should be taken. 72 C.J.S. Supp. Products Liability § 28; *Restatement of the Law* 2d Torts § 388, pp. 301, 308–310; Frumer and Friedman, *Products Liability,* Vol. 1 (1978) § 803[3], pp. 176, 180, § 805[3], pp. 186.13.

## (D)

■ 13. "Generally, 'proximate cause' in the admiralty context is defined as that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened." *Olympic Towing Corporation v. Nebel Towing Company, Inc.,* 419 F.2d 230 (5th Cir.), cert. den. 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396. "In this circuit the proper standard to be applied in maritime tort cases is 'legal cause.'" *Chavez v. Noble Drilling Corporation,* 567 F.2d 287 (5th Cir.). "The elements of legal cause are negligence, a causal connection between the negligence and the injury, the invasion of a legally protected interest, and lack of a countervailing legally protected interest as a defense to liability." *Spinks v. Chevron Oil Company,* 507 F.2d 216, 223 (5th Cir.). The Fifth Circuit holds that an independent, intervening cause does not relieve a manufacturer if its negligence was a *substantial* factor and more than "but for" the fault. *Harrison v. Flota Mercante Grancolombiana, S.A., supra,* 577 F.2d at 984.

14. "[T]he concept of 'foreseeable risk' is universally taken to mean the foreseeability of a general kind or type of risk, rather than the foreseeability of the precise chain of events leading to the particular injury in question." *Hall v. E. I. DuPont De Nemours & Co., Inc.,* 345 F.Supp. 353, 362 (E.D., N.Y.).

545 F.2d 422, 426 N. 5; *Harrison v. Flota Mercante Grancolombiana, S.A., supra,* 577 F.2d at 988 N. 36. On the development of products

15. "By the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony." *Minerals & Chemicals Philipp Corporation v. S.S. National Trader,* 445 F.2d 831, 832 (2nd Cir.). "When direct proof of causation is lacking, 'the causal connection can be shown by facts and circumstances which, in the light of ordinary experience, reasonably suggests that the [party's] negligence in the manner charged operated proximately to produce the injury.'" *United States v. Standard Oil Company of California,* 495 F.2d 911, 916 (9th Cir.).

## (E)

■ 16. "[D]efendants are not exonerated because their product met Department of Agriculture [or Coast Guard] standards. A person may be guilty of negligence while acting within the bounds of the law." It was emphasized by the Fifth Circuit that "[n]o attempt was made by defendants to give a complete disclosure of the existence and extent of the risk involved. Such obligation exists whether danger lies to human life or to property." *Alman Brothers Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc.,* 437 F.2d 1295, 1300, 1303 (5th Cir.).

17. A statutory standard is no more than a minimum and "does not necessarily preclude a finding that the actor was negligent in failing to take additional precautions." This is equally true of administrative regulations. However, "if there are unusual circumstances, or increased danger beyond the minimum which the statute was designed to meet, it may be found that there is negligence in not doing more." Prosser, *Law of Torts* (Hornbook Series, 1971), pp. 203–204.

## (F)

■ 18. In fulfilling the obligation to a shipowner under the stevedore's warranty

liability in maritime law see article by Paul S. Edelman, *Forum* XIV (Fall 1978), pp. 230–250.

of workmanlike performance, the latter owes the vessel a duty to use ordinary care and diligence. *New Orleans Stevedore Co. v. North Atlantic & Gulf S.S. Co.,* 213 F.2d 859 (5th Cir.). Inescapable elements of a stevedore's undertaking are "competency and safety." *Ryan Stevedoring Co., Inc. v. Pan-Atlantic Shipping Corp.,* 350 U.S. 124, 133; *LeBlanc v. Two-R-Drilling Company,* 527 F.2d 1316, 1319 (5th Cir.). The stevedore's warranty includes cargo damage as well as personal injury. *Federal Commerce & Navigation Co., Ltd. v. Calumet Harbor Terminal, Inc.,* 542 F.2d 437, 441 (7th Cir.).

### (G)

19. *Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457 (5th Cir.) is heavily relied on by defendants and undoubtedly presents some difficulty. There the Fifth Circuit reversed a judgment against E. I. DuPont which was based on its alleged failure to warn and its strict liability for failure to furnish adequate warnings in connection with a shipment of benzine which is a flammable, toxic liquid it produces. DuPont had placed two Cargo Information Cards, promulgated by the Manufacturing Chemists Association, aboard the barge. Normally, it also attached a product identification to the bills of lading. The Fifth Circuit said in *Martinez* that "The adequacy of DuPont's warnings in this regard cannot be evaluated apart from the knowledge and expertise of those who may reasonably be expected to use or otherwise come in contact with the product as it proceeds along its intended marketing chain." The crew had actual knowledge of the hazards associated with petrochemicals. The Fifth Circuit reversed the finding against DuPont on the theory that under the circumstances the warnings were adequate and the benzine was not unreasonably dangerous to the experienced crew. 529 F.2d at 465–467.

In the present case we do not have the same degree of knowledge or expertness by the stevedore or its longshoremen. A factual issue may well exist as to whether the warnings by Olin fully and adequately disclose the nature and extent of the serious risks involved in the handling of HTH cargoes.

### (H)

20. Where two parties by their fault contribute to property damage in a maritime collision, the damage must be allocated among them proportionately to the comparative degree of fault of each. *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251. The eager response of the lower courts was to extend the proportionate liability beyond maritime collisions. See *Griffith v. Wheeling Pittsburg Steel Corporation,* 521 F.2d 31, 44 (3rd Cir.); *Harrison v. Flota Mercante Grancolombiana, S.A., supra,* 577 F.2d at 982.

### V.

### *Ultimate Findings of Fact*

(a) This Court finds that the fire aboard the *Nicolaos* started in the HTH.[16]

(b) The cause of the fire was the contact between HTH spilled or present in the hold and some organic material left there by the shoring gang.

(c) HTH is an extremely dangerous cargo, and a high degree of caution must be exercised to minimize the danger involved.

(d) The cargo claimants have failed to meet their burden that the fire resulted from the personal fault or neglect of the shipowner. Even under the more stringent standard announced in *Sunkist Growers, supra,* the shipowner cannot be held liable. The latter is protected by the Fire Statute and the COGSA exemption.

---

**16.** At oral argument in the case held on August 15, 1977, I said, "Well, I don't think there's much question about that as a hypochlorite fire, a calcium hypochlorite fire. Of course, they dispute it, but that's the distinct impression I had at the end of the case." No other reasonable explanation exists for the eyewitness versions. Expert testimony established that no other type of fire would have produced similar phenomena.

■ (e) Georgia Ports Authority was not negligent in its handling of the drums. It had no further responsibility after turning over control of the shipment to Smith & Kelly.

■ (f) Smith & Kelly was negligent in allowing HTH spillage to be present in the hold of the ship in the immediate vicinity of some organic material and in failing to discover or remove it.

(g) Olin was negligent in failing to adequately warn the stevedore of the dangerous characteristics of HTH under certain conditions.

(h) The negligence of Smith & Kelly and that of Olin constituted legal causes of the fire aboard the *Nicolaos*.

(i) Smith & Kelly is 15% liable for the damage caused by the HTH fire on the *Nicolaos*; Olin is 85% liable.

### VI.

### *Comments on Certain Ultimate Findings of Fact.*

The findings in respect to fault and allocation of liability as between the manufacturer and stevedore require explanation beyond what was said in that connection in (f), (g), (h), and (i) of Part V.

■ As pointed out earlier in this Opinion, a manufacturer of a product which can produce serious results under certain conditions cannot merely rely upon use of the yellow sticker sign required by 46 C.F.R. § 146.05–17(g). Ordinary care may require more where failure to disclose fully the existence of a risk to life or property. *Allman Brothers Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc., supra*, 437 F.2d 1295.

The yellow warning sticker (see footnote 6 *supra*) warns users that the product must be kept away From FIRE, HEAT and OPEN-flame LIGHTS. Normally, a person who reads this caution is going to be mainly wary of keeping the packages away from fire, heat or lights. They are seldom to be found in a freight car and a ship's hold. The "CAUTION" appears in large letters. In smaller print below there is the instruction: "Remove Carefully the Contents of Broken Packages." No explanation is contained as to what might occur and why if spilled contents of HTH are not removed. The warning notice is silent as to the propensities of the product and the necessity of not allowing it to come in contact with grease, oil, sawdust or other organic material.[17]

On each of the drum heads was another label. It was directed primarily to users and dealers and not handlers of HTH. See Tr. 8, 82–83. The label contained in large print "DANGER" and immediately below appeared the instruction "Do not mix with anything but WATER." The drum head sticker stated:

"1. While HTH by itself is not a combustible material, it must not be mixed or contaminated with any foreign material such as, house hold products, soap products, paint products, solvents, acids, pool chemicals, vinegar, beverages, oils, pine oil, dirty rags, etc. Contamination or mixing with these types of chemicals and products, may result in fire and the fire can be of great intensity."

Also furnished to users of HTH was a "wall chart" which recommended that since the product was a powerful oxidant it should be kept away "from combustible organic material. Do not contaminate with any foreign matter. Contamination may result in fire and the fire will be of great intensity."

Compared to the precautions provided for safety of consumers and their property that given to cargo owners and vessels does not appear to have a high priority as far as Olin is concerned.

The magnitude of the risk demands all the more care as to adequate caution to

---

17. Dr. Faust testified that the reason for the yellow label was to show that the material was an oxidizer and that "the purpose of that is a man doesn't even have to read anything." Tr. 8, 17. He further testified that "When longshoremen see the yellow label, that means to them, if there's any spilled material or broken drum, get it up and out." Tr. 8, 83.

those who handle the product. Reasonable care under the circumstances would require more detail and information than what appears on the yellow label. It would not be too excessive a burden for Olin to provide specific notice of the attendant dangers on the bill of lading itself. Nor would it have been too expensive to give written notice to inland and water carriers frequently transporting sizeable shipments of HTH more information than that disclosed on the label or available in the *Code of Federal Regulations.*

■ "[T]he cost of printing and attaching labels and other warning devices is often regarded as trivial compared to the risk of any substantial harm." *Hall v. E. I. DuPont De Nemours & Co., Inc., supra,* 345 F.Supp. at 366. I realize that to emphasize the element of *Danger* on the package sticks in the gullet of any manufacturer. The claim that the necessary warning on a product would destroy the market falls on deaf judicial ears. Courts are more concerned with safety than salesmanship. If a warning is required, "the failure to give it is not excusable on the ground of its possible adverse effect upon the company's business." *Brizendine v. Visador Company,* 437 F.2d 822, 828 (9th Cir.).

■ Failure to provide adequate warnings, when required, constitutes a "defect" in the product and, without more, will cause it to be unreasonably dangerous or unsafe. *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1274–75 (5th Cir.), cert. den. 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688; *Gordon v. Niagara Machine & Tool Works,* 574 F.2d 1182, 1190 (5th Cir.); *Martinez v. Dixie Carriers, Inc., supra,* 529 F.2d at 465.

Turning to the matter of the 85%—15% allocation of liability between Olin and Smith & Kelly, this Court has taken into consideration the following.

## VII.

## OLIN

The source, the nidus, of the events at the Ocean Terminal on March 14, 1970 was the shipment by Olin of its high-risk product knowing that it would be handled in the transportation chain by persons not fully aware of any danger or made aware by means of the label or otherwise. The risk of a fire was foreseeable. Olin's negligence was the central factor in the outbreak of the fire aboard the *Nicolaos.* Its was the leading role. While the other parts were important, they were not top billing.

A chemical manufacturer knows or because of its expertness should know the propensities of the product and the hazards to persons under certain conditions. *Boyl v. California Chemical Company,* 221 F.Supp. 669, 675 (D.Or.); *Hopkins v. E. I. DuPont De Nemours & Co.,* 199 F.2d 930, 933 (3rd Cir.). Apart from its expertise in chemistry, Olin was fully aware of the danger of fire and explosion of HTH. An inter-Company communication in December, 1969 stated that "Incidents involving calcium hypochlorite have resulted from contamination with . . . organic substances, and other oxidizable materials." Pl. ex. 64–2.

## SMITH & KELLY

In the portion of this Opinion which deals with legal principles I referred to the warranty by a stevedore to the shipowner as to workmanlike performance. Its duty of ordinary care applied generally to cargo owners. In the case of damage to cargo caused by the negligence of a stevedore, it is liable for its negligence. *Demsey & Associates v. S.S. Sea Star,* 461 F.2d 1009, 1016 (2nd Cir.).

In the event that the officials, supervisors and longshoremen of Smith & Kelly were fully cognizant of the nature, extent and cause of the risk involved in handling HTH, the adequacy of the yellow labelling could become immaterial. *Cf. Martinez v. Dixie Carriers, Inc., supra,* 529 F.2d at 466. But such was far from true in this case.

The stevedore's awareness of the dangers attending handling hypochlorite extended little beyond the fact that "yellow sticker" cargo was being handled. Knowledge that it was an oxidizing agent was not a red flag of danger of fire and explosion. It may be

of value to examine the testimony of Smith & Kelly's witnesses as to their knowledge of the dangers involved and the consequent obligations in handling the product.

The stevedore foreman, Carter, knew that the shipment was yellow label cargo, and instructed the header (Lawyer) to *handle the drums carefully* and to send any broken ones out of the hold. Lawyer testified that Carter had told him "to handle it real careful, not to drop them." He was instructed to send spillage out of the hold. None of the longshoremen reported seeing such, or any damaged drums although several drums had loose lids. Both Lawyer and Reynolds noticed the smell of chlorine in the hold. Chlorine is a constituent of HTH. As mentioned in Finding of Fact 44, Reynolds observed a pile of white granular substance on a pallet in the hold.[18]

Apparently, neither the stevedore nor the longshoremen knew that HTH, even in small amounts, could react with organic material to start a fire. Mr. Carter was aware that HTH was an "oxidizing material that gives off considerable oxygen if it's exposed to heat", but he "didn't have any idea what would happen" if HTH came into contact with sawdust or other organic material.

Only one Smith & Kelly witness testified on the upper level of executives. The Assistant Operations Manager of the stevedoring company, Mr. Biezenbos, stated that he looked but never found any information or instructions from Olin as to the loading or storing of the cargo or its propensities and chemical reactions. Dep. p. 13. The yellow label meant that it was an oxidizing material but as he was not a chemist, it did not mean much to him other than the fact that when they came across such a label it signified "watch this stuff." Dep. p. 56.

This Court earlier discussed the shortcomings of the information furnished on the yellow sticker and the emphasis on the risk of fire if directions are not strictly followed by the stevedore. In addition, Olin might have emphasized the risk and causes thereof upon the stevedores and inland carriers frequently engaged in the transportation of HTH by written communication directed to the heads of all such companies. Further, the bill of lading itself could have included instructions to handlers and the necessity of care and why.

I do not mean to say that a stevedore should become an expert in chemistry. However, it is certainly not asking too much to know the basic properties of the "yellow ticket" cargo involved where serious risk to the ship and other cargo is involved if directions are not strictly followed. I do not know how many types of oxidizing agents there are. But a stevedore who exercises a high degree of care, which he should when dealing with "yellow ticket" cargo, ought to know the properties, risk and the method of handling each in the interest of maximum safety.

Smith & Kelly was negligent. The evidence fully justifies that finding.

However, Olin's knowledge of the danger and the risk of HTH far exceeded that of the stevedore. It failed to adequately warn handlers of the danger attending the stowage of calcium hypochlorite. This brings the Court back to what it said at the beginning of this Part (VII) of the Opinion.

The precursor and genesis of the fire was the negligence of Olin in failing to furnish adequate warning on its label or otherwise. Its fault runs through the case from the beginning to the outbreak of the fire aboard the *Nicolaos*. The intervening negligence of the stevedore does not destroy the legal effect of Olin's dereliction in shipping a product that was unreasonably dangerous due to the inadequate warning.

### ORDER

In accordance with the foregoing findings and conclusions, judgment will be entered in favor of the vessel, the shipowner, and the cargo interests against Olin Corporation and Smith & Kelly Company. Olin will be

---

**18.** Counsel for Olin referred to this witness as "the infamous Willie Reynolds who saw this pile of material right there on the corner of a pallet." Tr. 8, 33.

liable to the prevailing parties for 85% of the damages; Smith & Kelly for 15% thereof.

Judgment will be entered in favor of Georgia Ports Authority as to all claims against it.

Judgment will be entered in favor of the vessel and shipowner in respect to the claims of the cargo interests.

A date for the original evidentiary hearing or a conference with counsel as to the extent of the damages will be assigned.