514 F.Supp. 378 (1981)
L & L MARINE SERVICE, INC., Plaintiff,
v.
KORF TRANSPORT CORPORATION et al., Defendants.
No. 79-1479A(2).
United States District Court, E. D. Missouri, E. D.
May 12, 1981.
Michael D. O'Keefe, Thompson & Mitchell, St. Louis, Mo., for plaintiff.
Fritz Faerber, Lucas & Murphy, St. Louis, Mo., for defendants.

MEMORANDUM
NANGLE, District Judge.
This case is now before the Court for decision upon the merits. Plaintiff brought *379 this suit under the admiralty and maritime laws of the United States seeking to recover for damages to its barges allegedly caused by the carriage of defendants' cargo.
This case was tried before the Court sitting without a jury. This Court, having considered the pleadings, the testimony of the witnesses, the depositions and exhibits in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
Plaintiff is a corporation organized and existing pursuant to law. It is the owner of two ocean-going cargo barges, P-31 and P-34, which are used for the transportation of cargo between various ports in the United States. These barges were constructed for plaintiff by Jeffboat, Inc. of Jeffersonville, Indiana. Barge P-31 was delivered to plaintiff in March 1976. Barge P-34 was delivered to plaintiff in March 1977, and had made only one voyage prior to those involved in this lawsuit. The decks and hatch covers of both barges were treated with protective substances to protect the underlying metal of the barges from rust and corrosion  P-31 with chlorinated rubber and P-34 with coal tar epoxy.
In late March or early April 1977, George Jacobson, President of plaintiff, was contacted by William Law of Allied Towing Company, with regard to the possible chartering of two ocean-going barges for a voyage from Georgetown, South Carolina to Beaumont, Texas. Law was acting on behalf of defendants.[1]
Defendants desired to ship Midrex iron ore concentrate pellets. These pellets had undergone a direct reduction process in which the iron ore was purified by the elimination of oxygen in the ore, leaving only pure iron. These pellets were highly reactive with air and water, especially water, and would react with water to rust and return to an unpurified form. Such a reaction would produce large amounts of heat.
Due to these qualities of the pellets, Law expressed to Jacobson the need for a watertight cargo compartment. He also indicated a desire to install heat sensors in the cargo holds to monitor the pellets during the voyage.
Jacobson was initially reluctant to enter into the charter party due to his unfamiliarity with iron ore concentrate pellets and his concern over possible problems arising from the reaction described by Law. To calm his fears, Law agreed that defendants would indemnify plaintiff for any damages arising from an "inherent vice" of the cargo. Jacobson thereupon agreed to the charter party.
A voyage charter party was signed by the parties on or about April 11, 1977. The charter party provided for the shipment of iron ore concentrate pellets in two barges from Georgetown, South Carolina to Beaumont, Texas in early May. The charter party was a two part standard form contract, with the first part containing particulars as to the voyage in question and the second part containing standard clauses. The portions relevant to the disputes between the parties are as follows:
PART I
. . . . .
E. ...
Demurrage: at Loadingport, the demurrage rate shall be one hundred seventy five dollars ($175.00) per hour. At Dischargeport, the demurrage rate shall be one hundred dollars ($100.00) per hour. If Charterer elects release towboat at dischargeport, demurrage *380 rate shall be reduced to seventy dollars ($70.00) per hour.
F. Stevedoring: The Charterers shall open and close all hatches with shore crane. The Charterers shall load, trim, discharge and sweep up the cargo, free of risk and expense to the owner. ...
. . . . .
I. Special Provisions:
. . . . .
(B) Charterer shall indemnify owner against any inherent vice of the cargo that may damage the vessel.
. . . . .
PART II
. . . . .
2. Stevedoring and Lighterage.  a) ... where Charterer loads or discharges the Charterer shall be responsible for cleaning the cargo compartments at Charterer's expense and on his time. Cleaning shall mean swept holds with refuse removed except on cargo where custom provides more complete cleaning.
. . . . .
12. Demurrage, Despatch, Overtime. ...
h) Overtime  Right of Owner to Order: Notwithstanding the fact that the quantity stipulated in Part I hereof may be loaded or discharged during or before the end of the usual working hour day, the Owner reserves the right to order the Vessel to load or discharge as fast as she can twenty-four consecutive hours per day, each and every day, Sundays and holidays included or during any part of any or all days beyond the usual working hours. In that event and if the Charterer neglects or refuses to use due diligence to perform during straight or overtime hours any of the obligations on its part to be performed pursuant to this Charter Party, the Charterer shall pay as liquidated damages a sum computed upon the rate of demurrage stipulated in Part I hereof for each and every hour of work requested by the Owner which is not worked without regard to the allowed or used lay time.
. . . . .
Prior to the performance of this first charter party, plaintiff and defendant entered into a second such contract. This second charter party was identical in all significant respects to the first, with the addition of a front-haul shipment of chrome ore from Burnside, Louisiana to Charleston, South Carolina. Since the first charter party had not yet been performed, modifications of the second based upon experience with the actual execution of the first were obviously not possible. This second charter party was signed by the parties on or about May 12, 1977.
Barges P-31 and P-34 were initially delivered to Georgetown, South Carolina on or about May 7, 1977, to be loaded with the iron ore concentrate pellets. After correction of a slight problem concerning the water tightness of the cargo compartments, the barges were loaded by stevedores employed by defendants. A representative of plaintiff was present at the loading, and upon completion of the loading he certified that the stevedores had done their job to his satisfaction. Plaintiff's representative at the loading possessed authority to hold up the shipment until the decks were cleaned to his satisfaction, but to have done so would have caused substantial complications as to responsibility for demurrage charges.
Substantial amounts of pellets and dust from the cargo were left on the decks and hatch covers after the loading. No efforts were made to sweep these surfaces clean. At that time, plaintiff was unaware of the potential damage to its barges from this debris on the decks. Though defendants' personnel were aware of potential problems, they had not so informed plaintiff. The owner's representative at the loading was concerned primarily with whether the cargo was properly loaded and trimmed, and with whether the barges had been damaged by the heavy equipment used in the loading. He was not particularly concerned *381 with the debris left on the deck, since he was unaware of the potential damage which could be caused by such debris.
Barges P-31 and P-34 arrived in Beaumont, Texas for unloading on or about May 19, 1977. After the unloading, as at each subsequent loading or unloading, an owner's representative certified that the stevedores hired by defendants had done their job to his satisfaction. After this first voyage, the decks and hatch covers of the barges were substantially discolored by rust caused by the dust and pellets which had been left on these surfaces. Also, some pellets had reacted with water encountered during the ocean journey and had fused with the metal of the barge, penetrating the protective coverings. Plaintiff made no complaints at this time, however, and made no demands that the decks and hatches be cleaned.
The barges were then delivered to Burnside, Louisiana to pick up the chrome ore for transportation to Charleston, South Carolina. After discharging the chrome ore in Charleston, the barges were then transported to Georgetown to pick up the second iron ore concentrate shipment.
The second voyage proceeded much as had the first. Though plaintiff's representatives at the loading and unloading had noticed the damage to the decks and hatch covers, they made no demands upon the stevedores for extra precautions or extra cleaning. Captain Bowman, who was present at the second unloading did notify Jacobson, however.
At that time, Jacobson and Law were negotiating the terms of a third voyage charter party. Jacobson mentioned the problems which had developed and sought additional protection. Defendants agreed to the addition of a provision to the "Stevedoring" section of Part I of the charter party which provided that "on completion of loading and discharge, all cargo residue shall be removed from decks and hatch covers." The third voyage charter party also recognized that it was, in essence, a continuation of the first two contracts.
The third voyage was completed in late July. At that time, plaintiff hired a surveyor to survey the damage caused by the rust and the fusion of pellets to the metal of the barges. A surveyor also inspected the barges on behalf of defendants. Attempts to broom sweep the decks and hatch covers clean were unsuccessful, and it was impossible to determine the extent of the damage to the integrity of the protective coatings until further cleaning efforts were undertaken.
Plaintiff informed defendants at this time that it considered the cleaning to be defendants' responsibility and that demurrage charges would continue until the barges were satisfactorily cleaned. Defendants felt further cleaning was unnecessary and would not do anything further.
Plaintiff had the barges transported to Weaver Shipyard and Drydock facilities in Orange, Texas, for repairs. High pressure water cleaning was unsuccessful in removing the rust and the fused pellets, and it was necessary to sand clean substantial portions of the decks and hatch covers of the barges. In so doing, the integrity of the protective coatings was damaged. Any break in the protective coating would allow moisture to come in contact with the underlying metal, and rust and corrosion would thereafter spread under the coating. It was therefore necessary to reapply a thin coating of coal tar epoxy to the barges. Only those areas where the protective coatings were broken were so treated. Rust on the hulls of the barges was not removed, since plaintiff was desirous of returning the barges to service as quickly as possible and it was felt repairs to these areas could be postponed.
Barge P-31 was in the shipyard for repairs from 5:40 p. m. on August 4, 1977 until 3:00 p.m. on August 27, 1977. Barge P-34 was in the shipyard for repairs from 5:30 p. m. on August 1, 1977 until 6:00 p. m. on August 16, 1977. Though certain other work was performed on the barges during these times, the barges would not have been discharged substantially sooner otherwise. The work on Barge P-31 would have been *382 completed one day earlier had the other work not been done at this time.
Weaver charged plaintiff fifteen thousand five hundred twenty-three dollars and ninety-two cents ($15,523.92) for the repairs on Barge P-31, and fifteen thousand six hundred fifty-six dollars and twenty-three cents ($15,656.23) for the repairs on Barge P-34. There is no evidence in the record as to when plaintiff paid these amounts, but plaintiff billed defendants for these amounts on November 2, 1977. Also included on the invoices from plaintiff to defendants were plaintiff's demands for demurrage charges totalling approximately sixty-five thousand dollars ($65,000.00) for the time the barges were at Weaver Shipyard. Defendants have refused to pay these amounts.
The amounts charged by Weaver Shipyard for repairs to the barges were fair and reasonable. Though plaintiff did not obtain competitive bids on the repair work, the charges were in line with the customary charges in the area. The amounts billed to defendants were traceable to the damage arising from the carriage of the iron ore concentrate pellets.
Plaintiff also incurred a surveying charge of one thousand five hundred sixty-one dollars ($1,561.00) in connection with the damage to the barges. This amount is fair and reasonable.

CONCLUSIONS OF LAW
This is an admiralty and maritime claim within the meaning of Rule 9(h), Federal Rules of Civil Procedure, and this Court has jurisdiction thereof pursuant to 28 U.S.C. § 1333.
Plaintiff's barges were damaged when dust and pellets from defendants' cargo were left on the decks and hatch covers of the barges. This debris reacted with water and air, leaving extensive rust stains on the surfaces of the barges, and damaging the barges' protective coatings. The issue is whether defendants are responsible for this damage. This Court must conclude that they are.
The voyage charter parties involved in this suit are to be construed as are all contracts. The rules of construction applicable to ordinary contracts apply with equal force to charter parties. Michael v. S.S. Thanasis, 311 F.Supp. 170 (N.D.Cal.1970). The charter party should be construed according to the intent of the parties as manifested by the entire instrument, rather than by the literal meaning of any particular clause taken by itself. Nitram, Inc. v. Cretan Life, 599 F.2d 1359 (5th Cir. 1979).
The "Stevedoring" section of Part I of the voyage charter parties unmistakably placed the obligation on defendants to ensure that the cargo was properly loaded. That section stated in part that the Charterers would load, trim, discharge and sweep up the cargo, free of risk and expense to the owners. Such a provision has been held to require the charterer to indemnify the owner for any damages resulting from improper performance of the loading, discharging, or related activities. Fernandez v. Chios Shipping Co., Ltd., 542 F.2d 145 (2d Cir. 1976); Nichimen Company v. M.V. Farland, 462 F.2d 319 (2d Cir. 1972). Clearly, in light of their knowledge of the possible damage to the barges from debris left on the decks, defendants improperly performed their duties. Though Fernandez dealt with damage to the cargo, and Nichimen with injuries to the personnel unloading the cargo, there is no reason not to apply the same rule when dealing with damage to the barge itself.
Furthermore, prior to the last of the voyage charter parties, a provision was added specifically requiring defendants to remove all residue from the decks and hatch covers. This provision was meant to further protect plaintiff from possible rust and corrosion damage. Defendants argue, relying on the language of the "Stevedoring and Lighterage" section of Part II of the voyage charter party,[2] that this provision only obligated *383 them to broom sweep the decks and hatch covers. The language relied on however, when read in light of the surrounding language, Nitram, Inc., supra, is only applicable to defendants' obligation to clean the cargo compartments, not to their obligation to remove all residue from the decks and hatch covers. Defendants clearly failed in their obligation to remove all residue.
Even were the voyage charter party not construed to place the obligation on defendants to keep the decks and hatch covers clean, they would still be liable to plaintiff for the damage caused by the dust and pellets. For defendants specifically agreed to indemnify plaintiff for all damage resulting from an inherent vice of the cargo, in response to plaintiff's concerns about the cargo. The tendency of the iron ore concentrate pellets or dust to rust and to react with water or air and to damage the surfaces on which it is left is clearly an inherent vice. Demsey & Associates v. S.S. Sea Star, 461 F.2d 1009 (2d Cir. 1972); Dorsid Trading Company v. S.S. Rose, 343 F.Supp. 617 (S.D.Tex.1972); Pan Amer. Trade Develop. Corp. v. M/V Helga Howaldt, 257 F.Supp. 721 (S.D.Fla.1966). Defendants are therefore obligated by the explicit terms of the voyage charter party to indemnify plaintiff for the resulting damage to the barges.
The releases signed by plaintiff's representatives at each loading and unloading do not relieve defendants of liability. Plaintiff's representatives were not concerned with dust or pellets left on the decks or hatch covers. In fact, plaintiff's representatives were unaware of possible damage, since defendants had failed in their obligation to inform plaintiff of the dangers of the cargo. Sucrest Corp. v. M/V Jennifer, 455 F.Supp. 371 (D.Me.1978); Ionmar Compania, Etc. v. Central of Ga. R. Co., 471 F.Supp. 942 (S.D.Ga.1979).
Plaintiff is therefore entitled to recover the cost of repair of its barges. Defendants claim that the repair charges are not sufficiently supported by the evidence, but defendants seek to impose too high a burden of proof on plaintiff. Plaintiff has shown that the repair charges were fair and reasonable and that the work done was necessitated by the damage caused by the cargo. This proof is sufficient. Mitsui O.S.K. Lines, K.K. v. Horton & Horton, Inc., 480 F.2d 1104 (5th Cir. 1973). Plaintiff need not document each and every hour worked on the barges or each and every supply used in the repair. The work was done by Weaver Shipyard and billed to plaintiff; plaintiff did not do the work itself.
Plaintiff is also entitled to recover the surveyor's charges. Navigazione Libera Triestina Societa Anonima v. Newtown Creek Towing Co., 98 F.2d 694 (2d Cir. 1938).
Plaintiff also seeks to recover demurrage charges for the time the barges were being repaired. Plaintiff has disclaimed any intent to prove loss of use, and relies entirely on the language of the charter party to support this claim.
This Court does not believe the isolated language[3] relied on by plaintiff supports the recovery of demurrage charges. When read in context, Nitram, Inc., supra, it is clear that the language relied upon does not apply to the case at bar. The section relates to the owner's right to order the charterer to discharge the cargo faster than required by the terms of the charter party, and the consequences of the charterer's failure to comply with such an order. The demurrage charge mentioned in that section relates only to overtime which the charterer refuses to work when ordered to do so by the owner. This case is therefore markedly different from Johnson Barge Company v. Mid-Valley, Inc., 243 F.Supp. 234 (S.D.Texas 1963), on which plaintiff *384 heavily relies. In that case, "[i]t [was] unmistakably clear that the Charterer assumed the obligation to return the barge in good order and condition or to pay the charter hire as liquidated damages until the barge be so redelivered in the same good order and condition as it was delivered to it." Id. at 237. Plaintiff's request for demurrage charges will be denied.
Finally, plaintiff is entitled to prejudgment interest on the damage award. Prejudgment interest is to be awarded in an admiralty case whenever damages lawfully due are withheld, unless exceptional circumstances dictate otherwise. Cargill, Inc. v. Taylor Towing Service, Inc., 642 F.2d 239 (8th Cir. 1981); United States v. Motor Vessel Gopher State, 614 F.2d 1186 (8th Cir. 1980); Mid-America Transp. Co., Inc. v. Rose Barge Lines, 477 F.2d 914 (8th Cir. 1973). No exceptional circumstances are present in this case. That plaintiff ultimately recovered less than it sought does not justify denial of prejudgment interest. Motor Vessel Gopher State, supra. Likewise, the two year delay in bringing suit is not so dilatory as to justify denial of prejudgment interest, especially in light of the settlement negotiations which were ongoing during a portion of that period. Mid-America Transp. Co., Inc. v. Cargo Carriers, Inc., 480 F.2d 1071 (8th Cir. 1973). Since there is no evidence as to when the repair charges were actually paid, prejudgment interest will be allowed from the date of plaintiff's bill to defendants. Cf. Federal Barge Lines, Inc. v. Republic Marine, Inc., 616 F.2d 372 (8th Cir. 1980). Interest will be allowed at a rate of ten percent. Id.; cf. Motor Vessel Gopher State, supra at 1190.
NOTES
[1] Defendants in this action are Korf Transport Corporation and Georgetown Steel Corporation, both of which are corporations organized and existing pursuant to law. Georgetown is a wholly owned and controlled subsidiary of Korf. Throughout the actions preceding this lawsuit, these corporations were not differentiated. Likewise, the parties herein have treated these defendants collectively. This Court will do the same  hereinafter these corporations will be referred to collectively as "defendants."
[2] "Cleaning shall mean swept holds with refuse removed ..." The surrounding language is quoted supra.
[3] Plaintiff relies on the following phrases from Section 12(h) of Part II of the charter party: "... if the Charterer ... refuses to perform ... any of the obligations on its part to be performed pursuant to the Charter Party, the Charterer shall pay as liquidated damage a sum computed upon the rate of demurrage stipulated in Part I hereof for each and every hour of work requested by the owner which is not worked ..." The entire section is quoted supra.