IONMAR COMPANIA NAVIERA, S.A.,
as owner of the MOTORSHIP NI-
COLAOS D.L., Plaintiff-Appellee,

Central of Georgia Railroad Company, et
al., Defendants-Appellees,

v.

OLIN CORPORATION,
Defendant-Appellant,
Appellee,

v.

SMITH & KELLY COMPANY,
Defendant-Appellee, Appellant.

CLIMATROL INDUSTRIES, INC., et al.,
Plaintiffs-Appellees,

v.

M/V NICOLAOS D.L., et al., Defendants.

OLIN CORPORATION,
Defendant-Appellant,
Appellee,

v.

SMITH & KELLY COMPANY,
Defendant-Appellee, Appellant.

CONSOLIDATED BEARING COMPANY
PTY., LTD., et al., Plaintiffs-Appellees,

v.

M/V NICOLAOS D.L., et al., Defendants.

OLIN CORPORATION,
Defendant-Appellant,
Appellee,

v.

SMITH & KELLY COMPANY,
Defendant-Appellee, Appellant.

No. 79–2912.

United States Court of Appeals,
Fifth Circuit.*

Feb. 1, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Sewell K. Loggins, Michael V. Elsberry, Atlanta, Ga., for Olin Corp.

George H. Chamlee, Savannah, Ga., for Ionmar Compania Naviera, S.A.

Hill, Rivkinds, Carey, Loesberg & O'Brien, Martin B. Mulroy, New York City, for Consolidated Bearing Co., etc.

Hunter, Houlihan, MacLean, Exley, Dunn & Connerat, Spencer Connerat, Jr., Savannah, Ga., for Georgia Ports Authority.

Stanley M. Karsman, A. Lee Lassiter, Marshall R. Wood, Savannah, Ga., for Smith & Kelly Co.

Bouhan, Williams & Levy, Edwin D. Robb, Jr., Savannah, Ga., James F. Hart, New York City, for Climatrol Industries, Inc., et al.

Before TUTTLE, TJOFLAT and KRAVITCH, Circuit Judges.

TJOFLAT, Circuit Judge:

This admiralty case resulted from a fire that occurred aboard the dry cargo ship M/V NICOLAOS D.L. (the "NICOLAOS") as it was preparing to depart for Australia from the Port of Savannah, Georgia, on the night of March 14, 1970. The fire originated in a stow of "HTH," an algaecide and bactericide manufactured by Olin Corporation (Olin) for use in swimming pools and small drinking water systems. The NICOLAOS and much of its cargo sustained fire and water damage as a result of the blaze. Suits to recover for cargo losses were instituted in the district court by two groups of cargo interests against the NICOLAOS; its owner, Ionmar Compania Naviera, S.A. (Ionmar); the Georgia Port Authority; Smith & Kelly Company (Smith & Kelly), the stevedore who stowed the HTH aboard the vessel; Olin; and Central of Georgia Railroad Company and Southern Railway Company, the two railroads that transported the HTH from Olin's plant to Savannah. A third suit was filed by Ionmar against Georgia Port Authority, Smith & Kelly, Olin, and the railroads to recover for the damage to the NICOLAOS.

These cases were tried together to the district court. The court found that the fire was caused by the combined acts of Olin and Smith & Kelly and entered judgment against them for the cargo interests and Ionmar.[1] Olin and Smith & Kelly appeal; each contends that the district court's

---

1. The court dismissed the cargo claims brought against Ionmar and all claims against the Georgia Port Authority, Central of Georgia Railroad Company and Southern Railway Company. The correctness of these dispositions is not before us in this appeal.

findings of fact and conclusions of law [2] are insufficient to support the court's judgment. We conclude that the district court's findings of fact with respect to the origin of the fire—the cargo of HTH—are amply supported by the evidence. The court's findings of fact are inadequate, however, to permit us to assess the correctness of the court's conclusion that Olin and Smith & Kelly were entirely responsible for the fire. Additionally, the court neglected to make any findings of fact or conclusions of law with respect to Olin's and Smith & Kelly's contention that Ionmar's negligence, through the conduct of the NICOLAOS' master and crew, was a significant cause, if not the sole cause, of the fire; nor did the court address Olin's claim that Ionmar assumed the risk of the fire and resulting property damage when it accepted the cargo of HTH. We therefore vacate the judgment of the district court and remand these cases for further proceedings.

### I.

### A.

HTH is Olin's trade name for a chemical mixture composed of 70% calcium hypochlorite and 30% inert substances. It presents a serious fire hazard. HTH will decompose violently when it is heated to a temperature of 350°F or comes into contact with organic materials [3] in a liquid or semi-liquid state, such as oil or grease, or in a solid state but finely divided, such as sawdust. When HTH decomposes, enough heat is produced to ignite any combustible material. [4] Since the decomposition yields large quantities of oxygen, HTH is an oxidizing agent. The oxygen it yields can feed a fire to a point of extreme intensity. Such a fire cannot be smothered by a typical fire extinguisher, because HTH, and not the atmosphere, supplies the oxygen necessary to sustain combustion. In this case, the HTH cargo was contained in 286 steel drums, weighing 423 pounds apiece. Drums such as these, if heated to 350°F, will generate large quantities of gas (as the HTH decomposes), explode, and spread their fire-producing contents through a wide area. A conflagration of the magnitude presented here would be probable.

Because of its properties, HTH is subject to considerable regulation. At the time of the fire aboard the NICOLAOS, U. S. Coast Guard and Department of Transportation regulations classified HTH as a "dangerous article" under its generic name: "calcium hypochlorite compounds, dry, containing more than 39 percent available chlorine." 46 CFR § 146.04–5 (1970). These regulations applied to anyone who, like the parties in these consolidated cases, shipped, transported, loaded or stowed HTH. 46 CFR § 146.02–4.

Olin, as the shipper, was required to ship HTH in steel drums that met certain standards, see 46 CFR § 146.22–200–Table E, and to mark each drum with a 4″ × 4″, diamond-shaped, yellow label that warned all handlers to "Keep Away from Fire, Heat, and Open-flame Lights; CAUTION; Remove Carefully the Contents of Broken Packages; DO NOT DROP." See 46 CFR

---

2. The district court's findings of fact and conclusions of law are set out in the court's reported opinion. *Ionmar Compania Naviera, S.A. v. Central of Georgia Railroad Company et al.,* 471 F.Supp. 942 (S.D.Ga.1979).

3. Organic materials are substances distinguishable by the fact that they are partially composed of the element carbon. Almost all substances that are or have been alive are organic compounds. Examples of organic materials are wood, cotton and natural rubber. All petrochemicals and substances made from them are organics, e.g., plastics, gasoline and synthetic rubber. There are millions of organic materials.

4. The heat is about three times greater than that produced in a typical fire. For this reason, HTH is often used by arsonists in incendiary devices.

§ 146.05–17(g).[5] This is the same type of label the Intergovernmental Maritime Consultative Organization, a United Nations organization that promulgates model safety rules for international cargo carriers and stevedores, indicated should be used to mark any container bearing an oxidizing agent, like HTH. Olin also was required by these regulations to advise the NICOLAOS, in writing, of the following characteristics of the HTH cargo: the generic name of HTH and a description of HTH as an oxidizing agent; the weight of the shipment; the number of drums involved; and that each drum was marked with a yellow label.

The NICOLAOS, as ultimate carrier of the cargo, once informed by Olin of the hazardous nature of HTH, was required to note on its hazardous cargo manifest the information Olin provided, 46 CFR § 146.-06–14, and to transmit that information to Smith & Kelly, the stevedore the NICOLAOS hired to stow the HTH. Though Smith & Kelly had a contractual duty to the NICOLAOS to stow the cargo in a safe manner, the regulations nevertheless imposed on the NICOLAOS the responsibility of directing the stevedore's handling and stowage of the HTH. The NICOLAOS was permitted to carry its cargo of HTH "on deck protected," "on deck under cover," or in "tween decks." 46 CFR 146.22–200–Table E. Because the HTH was an oxidizing agent, however, it could not be stowed in these areas if the areas contained:

5.

KEEP
AWAY
From FIRE, HEAT,
and OPEN-flame LIGHTS

CAUTION

Remove Carefully the Contents of Broken Packages

DO NOT DROP

This is to certify that the contents of this package are properly described by name and are packed and marked and are in proper condition for transportation according to the Regulations prescribed by the Department of Transportation.

Shipper's name required hereon for shipments by
EXPRESS

*inflammable liquids . . . inflammable solids . . .* readily combustible materials such as combustible liquids and textile products . . . *finely divided substances such as organic powders, etc. . . .* corrosive liquids . . . [or] cotton.

46 CFR § 146.22–15 (emphasis added). Were leaking drums of HTH to be placed near such matter, the potential for HTH decomposition and fire would be great. Smith & Kelly was therefore instructed by the regulations not to onload any damaged or defective drums. See 46 CFR § 146.02–14.

In this case, Olin shipped the HTH in a steel drum approved by the Coast Guard and Department of Transportation regulations, properly labeled each drum, and communicated the necessary information about the shipment to the NICOLAOS. The NICOLAOS, in turn, entered this information on its hazardous cargo manifest and then communicated it to Smith & Kelly. Smith & Kelly decided to stow the HTH drums in the No. 3 tween deck, directly beneath the 19 ton hatch cover that secured the No. 3 hold; the NICOLAOS approved and the drums were stowed accordingly. The drums were onloaded with pallets and hand rolled into place by Smith & Kelly longshoremen. The stow was secured in two layers, with hardwood dunnage under each layer. To separate the HTH drums from the other cargo in the No. 3 tween deck, Smith & Kelly's shoring gang came aboard with some fresh pine lumber and constructed a fence around the drums. The gang cut the lumber in the tween deck, and there is some dispute whether any sawdust was left among the HTH drums. In any event, the shoring gang left the ship at 10:00 p.m. At 10:45 p.m., as the ship's crew was closing the No. 3 hatch, the fire broke out. It was first observed by some crewmen who saw a deep red glow through an opening between the hatch cover and the hatch coaming. A dense white vapor then began pouring out of the No. 3 hold. A moment later, an explosion lifted the 19 ton hatch cover into

the air and dropped it into the hold. Thereafter, the fire alarm sounded and black smoke began to pour out of the No. 3 hold.

The ship's crew, several fire boats and the Savannah Fire Department fought the blaze. Attempts to smother the fire with water from fire hoses and with carbon dioxide proved fruitless. The fire was not extinguished until early the next morning when the Nos. 2 and 3 holds and tween decks, which shared a large cargo area in the forward part of the ship, were flooded with water.

### B.

At trial, the cargo interests and Ionmar, in support of their respective claims, advanced two theories for the cause of the fire aboard the NICOLAOS. The first, the "rogue drum" theory, was that one of the drums of HTH contained an organic contaminant, inserted either by Olin or a subsequent handler of the drums, that caused the HTH to decompose. The drum exploded, sending hot HTH throughout the tween deck where it ignited combustible cargo that in turn caused other HTH drums to explode in a chain reaction. The second, the "spillage" theory, was that the fire started when some spilled HTH came into contact with organic material in the No. 3 tween deck. The HTH decomposed, heating nearby drums and causing them to explode, again in a chain reaction. Under both theories, the explosions were of sufficient force to lift the hatch cover into the air.

No direct evidence was produced by any party to pinpoint the origin of the fire. All that was shown was that it started in the No. 3 tween deck and developed, as the NICOLAOS crewmen testified, from a deep red glow to one or more violent explosions that blew off the No. 3 hatch cover. The cargo interests and Ionmar produced evidence describing the hazardous nature of HTH and how it was stowed aboard the NICOLAOS. They closed with expert witnesses who testified to the possible causes

of the fire, and on the basis of the evidence in the record, concluded that it probably started when spilled HTH and sawdust came together and generated enough heat to cause several drums of HTH to explode.

At the close of all the evidence, the defendants moved for judgment. The railroads and the Georgia Port Authority argued that the claimants had shown no wrongdoing on their part; the court agreed and they were dismissed from the case.[6] Both Olin and Smith & Kelly argued that the evidence concerning the origin of the fire was in equipoise, that the court would have to speculate whether the fire began in a rogue drum, in spilled HTH, or elsewhere on the ship. Since it was equally plausible that the fire was of unknown origin, in which event neither of them could be held responsible, their arguments concluded, the claimants had not carried the day and thus were not entitled to recovery. Ionmar, a defendant in the cases brought by the cargo interests, relied on an exemption under the Carriage of Goods by Sea Act (COGSA)[7] and on the Fire Statute[8] to escape liability. These statutes, it argued, required the cargo plaintiffs to show that the fire was caused by the personal neglect of the owner of the NICOLAOS, Ionmar, and plaintiffs had failed to make that showing.

The court took these motions under advisement, eventually disposing of them in its findings of fact and conclusions of law. In its findings, the court agreed with Ionmar that COGSA and the Fire Statute insulated it from liability to the cargo plaintiffs and accordingly entered judgment for Ionmar in the cargo cases. The court then addressed the question of whether the cargo interests and Ionmar had made out a case against Olin or Smith & Kelly.

The court found that the fire originated in the cargo of HTH, as the cargo interests and Ionmar contended. The court also found that the sequence of events were as their experts had testified: spilled HTH came into contact with organic matter, decomposed and generated enough heat to produce the explosions and ensuing conflagration the NICOLAOS' crewmen and others on the scene had described. The organic matter, sawdust, had been negligently left at the site of the HTH stow by the Smith & Kelly shoring gang that constructed the fence around the stow, and this negligence, the court concluded, was a cause of the fire. The court determined that Olin also was negligent because it failed to give Smith & Kelly adequate warning about the hazardous properties of HTH. The court found that Olin contributed 85% of the total actionable negligence and that Smith & Kelly contributed 15%.

The court did not address in its findings of fact and conclusions of law the contentions of both Olin and Smith & Kelly that Ionmar, through the conduct of the NICOLAOS' master and crew, was negligent, that Ionmar's negligence was the sole cause of the fire so as to absolve them of any liability to the cargo interests and to Ionmar, and that if not the sole cause of the fire, Ionmar's negligence was sufficient to operate as a partial bar to Ionmar's claim for damage to the NICOLAOS. Nor did the court address Olin's contention that Ionmar was barred from recovery from Olin because it assumed the risk of the fire and damage when it contracted with Olin to ship the

---

6. Central of Georgia Railroad Company and Southern Railway Company were dropped from the case immediately; the Georgia Port Authority was dismissed later when the district court entered its findings of fact and conclusions of law and rendered final judgment.

7. "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from
  *  *  *  *  *  *

(b) Fire, unless caused by the actual fault or privity of the carrier." 46 U.S.C. § 1304(2)(b) (1976).

8. "No owner of any vessel shall be liable to answer for or make good to any person any loss or damage . . . by reason or by means of any fire . . . unless such fire is caused by the design or neglect of such owner." 46 U.S.C. § 182 (1976).

HTH to Australia with full knowledge of its dangerous properties.

Thus, on the basis of its limited findings, that Olin and Smith & Kelly were jointly responsible for the fire, 85% and 15% respectively, the district court entered judgment against them for the losses sustained by the cargo interests and Ionmar.

## II.

■ Rule 52(a), Fed.R.Civ.P., required the district court to "find the facts specially and state separately its conclusions of law thereon. . . ." as a predicate for the entry of judgment in these non-jury cases. The rule did not require the court to state its findings of fact at great length and in detail; rather, it required the court to state them with sufficient detail to indicate the factual basis for its ultimate conclusions of law. Otherwise, appellate review is rendered practically impossible, and we are usually left with no alternative but to vacate the judgment and remand the case for further findings. *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316, 60 S.Ct. 517, 520, 84 L.Ed. 774 (1940); *Blacks United for Lasting Leadership, Inc. v. City of Shreveport*, 571 F.2d 248 (5th Cir. 1978); *Victory Towing Co. v. Bordelon*, 219 F.2d 540 (5th Cir. 1955).

■ Here, the district court failed to make any findings of fact or conclusions of law with respect to critical and material issues in the case: whether Ionmar, through the conduct of the NICOLAOS' master and crew, was guilty of negligence which proximately caused the fire and resulting property losses, and, if so, whether such negligence was the sole or merely a contributing cause of the catastrophe; whether the NICOLAOS, by accepting the hazardous cargo of HTH from Olin, assumed the risk of the fire damage it sustained and thus barred Ionmar from seeking recompense from Olin. We need not belabor the point that this deficiency in the court's findings and conclusions precludes us altogether from reviewing the correctness of the district court's ultimate decision that Ionmar recover damages from Olin and Smith & Kelly. This deficiency also makes it impossible for us to affirm the court's conclusion that the cargo interests were entitled to prorated damages from Olin and Smith & Kelly for the full amount of their losses; for to affirm that conclusion we would have to find that the NICOLAOS' crew did not cause the fire, a finding we cannot make as a matter of law on this record.

■ Despite these critical deficiencies in the court's findings of fact and conclusions of law, however, there are three issues in this appeal that we can appropriately address. The first issue is whether the evidence in these circumstantial evidence cases was in equipoise, as Olin and Smith & Kelly contend, so that it was just as probable that the fire was of an unknown origin and cause as it was that the fire originated in the HTH stow when spilled HTH combined with organic matter. If the inferences were equal, both Olin and Smith & Kelly were entitled to judgment, and we could so hold. *See Union Carbide Corp. v. M/V Irene Chotin*, 1974 A.M.C. 2231, aff'd. 498 F.2d 1400 (5th Cir. 1974). The second issue is whether the evidence established a negligent failure to warn case against Olin; if it did not, Olin is entitled to judgment. The third issue is whether the evidence established a case of negligent stowage against Smith & Kelly; if it did not, Smith & Kelly is entitled to judgment.

## A.

■ The evidence bearing on the origin and cause of the fire was not in equipoise; it plainly authorized the inference, drawn by the trial judge, that the fire began in the HTH stow when HTH decomposed on contact with some organic material left there by Smith & Kelly's shoring gang. This inference was compelling once the judge gave full credence to the opinions of admit-

tedly qualified experts and the testimony of those who observed the fire develop. The only organic material brought aboard the NICOLAOS by the shoring gang was fresh pine lumber; the only organic shown by the evidence to have had the potential of reacting with the HTH was the sawdust created when the gang cut that lumber. Oil and grease, two other organics, were mentioned in the testimony of the experts as elements that *possibly* brought about the HTH decomposition, but whether they were present and came into contact with HTH was pure speculation. The credible evidence that prompted the trial judge to accept the HTH spillage theory effectively ruled out the possibilities that the fire was the product of a rogue drum or started elsewhere in the No. 3 hold from some unknown cause. In sum, the district court's findings as to how the fire started are not clearly erroneous; we are bound therefore to accept them. Fed.R.Civ.P. 52(a). We proceed then to Olin's and Smith & Kelly's claims that the cargo interests and Ionmar failed to make out a case of liability against them.

## B.

■ Olin, as the manufacturer of HTH, had a duty to warn Smith & Kelly and the NICOLAOS of the foreseeable hazards inherent in the HTH shipment of which the stevedore and the ship's master could not reasonably have been expected to be aware. *See Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968, 977 (5th Cir. 1978); *Restatement (Second) of Torts,* § 388. Conversely, Olin had no duty to warn Smith & Kelly and the NICOLAOS of hazards of which they were aware or could reasonably have been expected to be aware. *Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457, 464 (5th Cir. 1976).

It is clear from the evidence that Olin gave both the stevedore and the ship's master some warning about the danger of an HTH cargo fire. Each drum of HTH bore the cautionary yellow label we have reproduced in the margin. See note 5, *supra.*

The labels met the requirements of the applicable Coast Guard and Department of Transportation regulations. Olin transmitted the required bill of lading describing the cargo to the NICOLAOS, and the NICOLAOS made the appropriate entry on its dangerous cargo manifest. The judge's findings do not tell us, however, what knowledge, aside from that disclosed by the labels and the bill of lading, the NICOLAOS actually had about the cargo of HTH prior to approving its stowage; nor do the findings tell us whether the NICOLAOS was charged under the circumstances with notice of the various governmental and industry regulations governing the stowage and transportation of oxidizing agents, such as HTH. Similarly, the findings do not indicate what Smith & Kelly knew or should have known about stowing this particular cargo.

The sufficiency of Olin's warning obviously cannot be evaluated in a vacuum; it can only be assessed in the light of the knowledge and expertise of the ship's master, its first mate (to whom the master delegated the responsibility of supervising the stowage) and the stevedore. *Martinez v. Dixie Carriers, Inc.,* 529 F.2d at 465, 466; *Helene Curtis Industries, Inc. v. Pruitt,* 385 F.2d 841 (5th Cir. 1967), *cert. denied,* 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968). Here, the district court foreclosed such an assessment; it failed to find what the NICOLAOS and Smith & Kelly knew, or should have known, about the hazards presented by Olin's cargo. Whether the cargo interests and Ionmar have a failure-to-warn case against Olin must await such a finding on remand.

## C.

Smith & Kelly asks us to conclude that as a matter of law it was not negligent in stowing the HTH drums. It was not negligent, it claims, because it had no knowledge of the danger associated with HTH; or having knowledge, it exercised due care. Our discussion, and rejection, of Olin's ar-

gument for judgment applies equally in Smith & Kelly's case. Until it is determined what Smith & Kelly knew or should have known under the circumstances, we cannot assess the first prong of its claim of no negligence. As for the second prong of its claim, the district court's findings are clearly inadequate. The findings tell us that organic matter, sawdust, and spilled HTH remained at or near the site of the Olin stow after the longshoremen completed their work and the shoring gang constructed the pine fence around the stow, but they do not indicate whether these elements were left there as the result of the stevedore's negligence or notwithstanding its exercise of due care.[9] Smith & Kelly's claim of no negligence, like Olin's, must therefore receive further findings on remand.

The judgments of the district court are vacated, and these cases are remanded for further proceedings not inconsistent with this opinion.

VACATED and REMANDED.

**9.** The court found that "Stevedore Foreman Harry Carter and Chief Officer Floratas [the NICOLAOS' first mate] inspected the hold after the shoring gang left. Neither saw anything out of the ordinary." 471 F.Supp. 942, 951 (S.D.Ga.1979). This limited finding is too per-

functory to support a conclusion on our part that Smith & Kelly exercised due care as a matter of law.

