Revised August 8, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 99-30002**

---

**CANAL BARGE COMPANY, INC.,**

**Plaintiff-Appellee,**

**VERSUS**

**TORCO OIL COMPANY; GULFSTREAM TRADING, LTD. COMPANY,**

**Defendants-Appellants.**

---

Appeal from the United States District Court
for the Eastern District of Louisiana

---

July 20, 2000

Before KING, Chief Judge, and DUHÉ and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Torco Oil Company ("Torco") appeals the magistrate judge's final judgment, after a bench trial, awarding $90,766 to Canal Barge Company, Inc. ("Canal Barge") for damages arising from the alleged contamination and loss of use of a barge. Finding no error on the part of the magistrate judge, we affirm.

## I. BACKGROUND

On July 11, 1996, Gulfstream Trading, Ltd. ("Gulfstream") agreed to purchase 18,000 barrels of reconstituted fuel oil, also known as spent lube oil, from Torco.  Under the agreement, the delivery was to occur between July 23 and July 25, 1996, at Torco's Chicago facility.  The purchase agreement further provided that an independent surveyor, Saybolt Inc. ("Saybolt"), would conduct pre-loading and post-loading inspections of the spent lube oil.  Gulfstream had the responsibility for procuring transportation.

As a result, Gulfstream's broker Seahull contacted Canal Barge to transport the spent lube oil.  Canal Barge agreed to provide the tank barge CBC-501 to transport the oil from Chicago to Louisiana.[1]  CBC-501 is a double-skinned tank barge assigned to Canal Barge's "clean" fleet.  Canal Barge divides its barges into three separate fleets: 1) the "dirty" fleet, 2) the "clean" fleet, and 3) the "chemical" fleet.  Both ships in the dirty and clean fleets transport petroleum products, including spent lube oil.  Those in the former primarily transport heavy oil products such as No. 6 oil and are rarely, if ever, cleaned while those in the latter concentrate on transporting light oil products.  Unlike the dirty barges, the clean ones are periodically cleaned between loadings.

---

[1]This was the fourth of four charter agreements that Canal Barge entered into with Gulfstream during 1995 and 1996 to transport spent lube oil from Torco's Chicago facility to Louisiana.  The other charter agreements had transpired without incident.

During the time of the charter agreement with Gulfstream, CBC-501 was dedicated to a long-term contract with Citgo Petroleum Corporation ("Citgo") for the transportation of clean lube oil from Louisiana to Illinois. For the CBC-501's return voyage to Louisiana, Canal Barge often practiced "backloading" other petroleum products, including spent lube oil. The charter agreement with Gulfstream was consistent with that practice. After backloading spent lube oil, a clean barge must be cleaned prior to being loaded with clean lube oil.[2] In the present case, CBC-501 was scheduled for a cleaning after transporting the spent lube oil contracted for on July 11.

After offloading Citgo's clean lube oil, the CBC-501 was towed to Torco's Chicago facility to load the spent lube oil from Torco's Tank 101. That tank is approximately 50 years old and was purchased by Torco from Amoco in 1981. It has been dedicated to spent lube oil storage and has never been cleaned by Torco. Since Torco's purchase, Tank 101 has been drained to its lowest level no more than one or two times.

When the CBC-501 arrived at the facility on July 26, Torco did not have enough barrels of oil in Tank 101 to fulfill the 18,000 barrel contract. Therefore, Torco officials determined to get every drop out of Tank 101 that they could and to load it onto the

_____

[2]Routine cleaning of a clean fleet barge is known as "butterworthing" and usually takes two to three days at a cost of $4,500 to $7,500. That cost was factored into the rate that Canal Barge charged Gulfstream under the charter agreement.

CBC-501. Normally, whenever Tank 101 contained an insufficient quantity of oil to fulfill a contract, Torco's practice was to monitor the transfer from the tank to the barge and to shut off the pump before the level of liquid in the tank fell to the bottom and the pump started sucking air. But at the time of loading the spent lube oil onto the CBC-501, the gauge on Tank 101 that discloses the quantity of product in the tank, as well as the amount being pumped out, was broken. The Torco worker assigned to monitor the pump hose permitted the pump to suck air for five to ten minutes.

After the loading was complete on July 27, the CBC-501 traveled to Louisiana, arriving on August 4, 1996. That day, unloading of the spent oil lube occurred, but nearly 188 barrels could not be discharged. Before loading, there had only been 37 barrels of oil from the prior cargo on board the CBC-501. Because of the discrepancy, Saybolt made a letter of protest on behalf of Gulfstream. Of the oil that had been discharged from the CBC-501, Saybolt analyzed and determined those barrels of oil as meeting Gulfstream's specifications. The analysis was not designed to test for the presence of benzene.

On August 6, the CBC-501 arrived at T.T. Coatings, Inc.'s ("TTC") facility for its scheduled cleaning. After butterworthing the barge, TTC officials observed at the bottom of the tanks a three to four inch residue of heavy, black, tar-like sludge on which a person could walk without sinking. The sludge looked more like No. 6 oil bottoms or shore tank bottoms rather than residue

4

from spent lube oil. According to Canal Barge's expert Richard Silloway, Torco's hose sucking air while draining Tank 101 allowed for the shore tank bottoms to flow into the barge. Such bottoms consist of a suspension of solids and semisolids in liquid, which precipitate out from the liquid over time, settle to the bottom, and are not generally pumped out or pumpable through the tank's system. In the present case, Silloway testified that the tank bottoms became entrained in the liquid as the tank was drained, and they were sucked out with the oil. The resulting sludge could not be removed from the barge by the ordinary cleaning process.

On August 8, TTC moved the CBC-501 to its repair yard because TTC officials believed that the cleaning would take two to three weeks and TTC had a three-week backlog of orders to do at the cleaning plant. During this time, Canal Barge had the barge's boiler replaced, which took two to three days. Canal Barge also notified Gulfstream about the sludge problem on August 9, to recover its costs pursuant to the charter agreement.[3] It further submitted two bids for the cleaning to Gulfstream on August 16, but Gulfstream refused to pay for the cleaning and disposal costs. Moreover, Gulfstream did not inspect the barge or attempt to reclaim the 188 barrels of sludge. On August 30, the barge was

---

[3]The cleaning provision of the charter party provided that "[a]ny cleaning required subsequent to the movement contemplated hereunder as a result of tank contamination or unusual buildup of cargo residue shall be for shipper's account and time so spent shall be counted as used laytime."

returned to the cleaning facility, and the cleaning began on September 4.

TTC officials testified that whenever it cleans heavy tank bottoms, federal and state regulations require testing of the material for hazardous components. TTC hired Environmental Analysts, Inc. ("EAI"), to do the analysis, and EAI reported that the material was found to contain hazardous materials as per Environmental Protection Agency ("EPA") regulatory thresholds promulgated in 40 C.F.R. part 261 and that the hazardous constituent was .971 parts per million (ppm) of benzene. The regulatory threshold for benzene in solid waste is .5 ppm. Pursuant to 40 C.F.R. part 261 and EAI's report, TTC officials determined that the material was hazardous.

On September 16, TTC began to muck out the sludge by hand and shovel into drums for disposal. TTC officials testified that there was no market for this material and that it had to pay a third party to dispose of the waste. The certificate of disposal and some testimony indicated that the sludge was eventually used for energy recovery. After the sludge was removed, the CBC-501 underwent additional hot-water and chemical cleaning and was placed back into service on October 25, 1996, 80 days after arriving at the TTC facility. Canal Barge incurred total costs of $60,966 for the necessary cleaning, disposal, and inspections.

Because Gulfstream failed to pay for the costs of cleanup, Canal Barge filed suit against Gulfstream and Torco. Canal Barge

charged Gulfstream with breach of contract and negligence and averred a negligence claim against Torco.[4] After a bench trial, the magistrate judge made findings of fact and conclusions of law, ruling in favor of Canal Barge and holding Gulfstream and Torco jointly and severally liable. But the magistrate judge reduced the amount by $5,720 because some of the disposal costs were wrongly calculated in the total costs. In addition to the cleanup costs, the magistrate awarded demurrage charges of $35,520.[5] While laid up for cleaning, the CBC-501 was unable to perform its contract work with Citgo. All of Canal Barge's other clean barges were in operation, and the company had no other comparable ships. Although Canal Barge utilized some smaller barges from its spot market to service the Citgo contract, a Canal Barge official testified that those barges were in an active market and would have been used for other jobs. Despite the lack of documentation, the magistrate judge credited the testimony of Canal Barge's official and allowed lost profits or detention charges of $480/day.[6] This appeal by

---

[4]The magistrate judge also recognized Canal Barge as having asserted a maritime products liability claim, a breach of warranty claim, and/or a claim predicated on Canal Barge having been the third-party beneficiary of the contract between Gulfstream and Torco. But its ruling only addressed Canal Barge's negligence tort claim.

[5]The contractual demurrage charge under the charter agreement was $480 per day. The magistrate judge multiplied that amount by 74 days, the time the barge was out of commission [80 days - 6 days, the time required for the boiler work and the regular cleanup].

[6]Canal Barge had claimed lost profits of $502 per day, but the magistrate judge went with the contractual demurrage charge of $480

Torco ensued.

## II. DISCUSSION

When a judgment after a bench trial is on appeal, we review the findings of fact for clear error and the legal issues de novo. *See* **Gebreyesus v. Schaffer & Assocs., Inc.**, 204 F.3d 639, 642 (5th Cir. 2000) (quoting **FDIC v. McFarland**, 33 F.3d 532, 536 (5th Cir. 1994)). Under the clearly erroneous standard, we will reverse only if we have a definite and firm conviction that a mistake has been committed. *See* **Mid-Continent Cas. Co. v. Chevron Pipe Line Co.**, 205 F.3d 222, 229 (5th Cir. 2000). "The burden of showing that the findings of the district court are clearly erroneous is heavier if the credibility of witnesses is a factor in the trial court's decision." **Dunbar Medical Sys., Inc. v. Gammex, Inc.**, 2000 WL 797247, No. 99-20274 at *9 (5th Cir. June 21, 2000) (quotation marks omitted). That's because "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. R. Civ. P. 52(a); **Torch, Inc. v. Alesich**, 148 F.3d 424, 426 (5th Cir. 1998) ("The factual findings of the trial court in a bench trial may not be set aside unless clearly erroneous and due regard must be given to its credibility evaluations."); **Ruiz v. Estelle**, 679 F.2d 1115, 1131, *amended in part & vacated in part*, 688 F.2d 266 (5th Cir. 1982) ("[I]n a bench

_____

per day.

8

trial the assessment of witness credibility is inherently his province."). We cannot second guess the district court's decision to believe one witness' testimony over another's or to discount a witness' testimony. *See **Brister v. Faulkner***, 214 F.3d 675, 684, (5th Cir. 2000). Thus, we are reluctant to set aside findings that are based upon a trial judge's determination of the credibility of witnesses giving contradictory accounts. *See **Ruiz***, 679 F.2d at 1131.

In contesting the judgment, Torco raises several legal and factual arguments: 1) the magistrate judge wrongly admitted the testimony of Richard Silloway, Canal Barge's expert testimony, with respect to the area of fluid dynamics; 2) the magistrate judge improperly inferred a legal duty on the part of Torco to Canal Barge; 3) the magistrate judge erred in determining that Torco's method of draining Tank 101 violated industry custom; 4) the magistrate judge erred in concluding that the product remaining on board the CBC-501 was a hazardous material under EPA standards; and 5) the magistrate judge should not have awarded Canal Barge lost profits. We review each of Torco's points of error in turn.

The admission of Silloway's testimony is reviewed for abuse of discretion. *See **Seidman v. American Airlines, Inc.***, 923 F.2d 1134, 1138-39 (5th Cir. 1991). Pursuant to Federal Rule of Civil Procedure 26(a)(2), Canal Barge was obligated to submit Silloway's expert report 90 days before the pre-trial conference. That report

did not deal with fluid dynamics or the process of draining land based storage tanks. Nevertheless, Canal Barge attempted to qualify Silloway on those topics; whereupon, Torco objected. The magistrate sustained the objection. In the cross-examination, however, Torco's counsel asked Silloway some questions about whether the tank bottoms would "settle out" inside a tank and stay there and whether a normal tank system would pump the bottoms out. To these questions, Silloway answered that in a normal tank system, the bottoms would not be sucked out. Interpreting the questions and the answers as vague, the magistrate judge elicited further testimony from Silloway as to whether the bottoms would have been pumped out in a system like Torco's Tank 101.

Reviewing the trial transcript, we conclude that Torco opened the door to Silloway's testimony. *See Rizzo v. Corning Inc.*, 105 F.3d 338, 341-42 (7th Cir. 1997). In essence, Torco's questions pertained to fluid dynamics and whether the shore tank bottoms could be pumped out of the tank. Due to the manner in which he was questioned, Silloway gave an unclear answer that did not actually comport with his views on the transferability of the shore tank bottoms. Hence, the magistrate judge was merely clarifying the cross-examination and seeking to understand the discussion of fluid dynamics that Torco had surreptitiously initiated. Accordingly, we

find no abuse of discretion in admitting Silloway's testimony.[7]

Torco's second point of error concerns the district court's ruling that Torco negligently pumped the spent lube oil into the CBC-501, thereby causing the residue buildup and the resulting cleanup costs. When analyzing maritime tort cases, we rely on general principles of negligence law. *See* **Daigle v. Point Landing, Inc.**, 616 F.2d 825, 827 (5th Cir. 1980); **Casaceli v. Martech Int'l, Inc.**, 774 F.2d 1322, 1328 (5th Cir. 1985) (citing **Daigle**). To establish maritime negligence, a plaintiff must "demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." **In re Cooper/T. Smith**, 929 F.2d 1073, 1077 (5th Cir. 1991). Here, Torco maintains that it owed no legal duty to Canal Barge. According to Torco, no cases specifically hold that a third-party cargo supplier, not contractually bound to a shipowner, owes a duty to the shipowner. Furthermore, Torco argues that if it had a duty, that duty only extended to foreseeable hazards. Because Torco had no knowledge of the kind of barge that Canal Barge planned on using and because a dirty barge could have transported the spent lube oil and would not have required the

---

[7]We also note that Torco did not apparently object at the time of the magistrate judge's questioning, although it may have been assuming that its prior objection was still in effect or running. When a party fails to object at trial, the standard of review is plain error.

cleanup costs, it contends that it had no reason to suspect that the spent lube oil product would pose any hazard to the CBC-501.

"'Whether a defendant owes a plaintiff a legal duty is a question of law.'" *Florida Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330, 333 (5th Cir. 1993) (quoting *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978)); *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987) ("Determination of the tortfeasor's duty, and its parameters, is a function of the court."). In *Ionmar Compania Naviera, S.A. v. Olin Corp.*, 666 F.2d 897, 904 (Former 5th Cir. 1982), the former Fifth Circuit held that a manufacturer/shipper of a product had a duty to warn a shipowner of the foreseeable hazards inherent in the cargo of which the ship's master could not reasonably have been expected to be aware. Conversely, the shipper had no duty to warn the shipowner of hazards of which the shipowner was aware or could reasonably have been expected to be aware. *See* *id.* Although *Ionmar* involved a shipper and shipowner who were in contractual privity, we still find the case instructive because the shipper's duty was predicated on tort, not contract, principles. *See* *id.* Indeed, *Ionmar* is consistent with this circuit's general statements on maritime negligence. As this circuit has recognized in the past, the determination of whether a party owes a duty to another depends on a variety of factors, "most notably the foreseeability of the harm suffered by the complaining party." *Consolidated*, 833

12

F.2d at 67. "'Duty . . . is measured by the scope of the risk that negligent conduct foreseeably entails.'" *Id.; see also* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.2, at 159 (2d ed. 1994). To explicate that concept, this circuit noted the following in *Consolidated*:

> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.

*Id.* at 68. With that statement and *Ionmar* in mind, we address Torco's second point of error.

According to elementary fluid dynamics, draining a tank with a suction pipe near the bottom to the point that it sucks air will create a greater tendency for the tank's bottoms to be drawn into the suction pipe and transported out.[8] Combine that knowledge, which a reasonably prudent person would have known, with the fact that Torco knew that there were tank bottoms in Tank 101 but had never tested the bottoms or cleaned the tank, and it was foreseeable that Torco's decision to "get every drop out of Tank 101," despite a broken tank gauge, and to allow the hose to suck air would pump shore tank bottoms into the CBC-501, damaging that

---

[8]That is because draining to the tank's bottom creates more lateral flow at a higher velocity across the bottom of the tank, thereby entraining the bottoms into the liquid and allowing those bottoms to be sucked out of the pipe.

13

boat. And although Canal Barge used a clean, rather than a dirty, boat to transport the oil, that decision did not preclude the existence of a duty on the part of Torco to Canal Barge. Clean boats were at times used to transport spent lube oil; thus, it was foreseeable that a clean barge would be brought to Torco's oil facility. Moreover, even dirty barges must be cleaned, and Canal Barge would have ultimately had to dispose of the residue material. Accordingly, we believe that Torco could have anticipated that its decision to drain Tank 101 down to the bottom and its failure to stop the loading of oil before the sucking of air would likely result in the harm suffered by Canal Barge, and therefore, we find no error in the magistrate judge's implicit conclusion that Torco owed a duty to Canal Barge.

Closely aligned with the element of duty is Torco's next point of error that the magistrate judge wrongly determined that Torco's method of draining Tank 101 violated industry custom. Although custom itself does not create a duty, "custom may help define the standard of care a party must exercise after it has undertaken a duty . . . ." *See* **Florida Fuels**, 6 F.3d at 334. First off, we note that there is little, if any discussion, of actual industry custom in the magistrate judge's findings of fact and conclusions of law, let alone the trial record. Other than a single reference to Silloway's comment that a reasonable operator would not drain a shore tank to a level where the pump is sucking air when the

14

operator knows that the bottoms contain sludge, there is no other statement that indicates that the magistrate judge may have considered the issue of custom. Thus, we are not of the view that custom played a role in necessarily establishing the standard of care.

In any case, we conclude that the magistrate judge did not clearly err if it presumed that Torco's draining of Tank 101 did violate industry custom. Notwithstanding the testimony that draining of a tank to the bottom had occurred on a few rare occasions and that problems had not ensued from those acts, the magistrate judge was the trier of fact, and he heard contradictory testimony that reasonable operators tested their tanks and did not drain them to the bottom. We must give due regard to his specific credibility determinations, and nothing leaves us with the definite and firm conviction that a mistake has been committed.

Torco next asserts that the magistrate judge incorrectly determined that the sludge product that remained on the CBC-501 was hazardous. It essentially disagrees with the court's assessment that TTC and Canal Barge did not err when they construed the residue pursuant to part 261 of the Code of Federal Regulations, rather than part 279. In general, part 279 governs the transportation and management of used oil and used oil residue. *See* 40 C.F.R. part 279. It excludes used oil that is to be used for energy recovery and certain other purposes from the hazardous

15

waste regulations of part 261. *See* **id.** § 279.10. Two of its subsections provide in pertinent part:

> (a)  Used Oil. EPA presumes that used oil is to be recycled unless a used oil handler disposes of used oil, or sends used oil for disposal. Except as provided in § 279.11, the regulations of this part apply to used oil, and to materials identified in this section as being subject to regulation as used oil, whether or not the used oil or material exhibits any characteristics of hazardous waste identified in subpart C of part 261 of this chapter.

> (e)(2)  Materials produced from used oil that are burned for energy recovery (e.g. used oil fuels) are subject to regulation as used oil under this part.

*See* **id.** (a) & (e)(2). Torco contends that the residue was used oil that was ultimately used for energy recovery and that should have been regulated by part 279.

EPA regulations, however, differentiate between used oil set for energy recovery and solid hazardous waste. *Compare* **id.** part 279, *with* **id.** part 261. Solid waste may include discarded material, which is material that has often been abandoned. *See generally* **id.** § 261.2. If the product is solid waste, then it is classified as hazardous waste based on certain characteristics of the material. *See* **id.** § 261.3. For example, solid waste that contains a certain level of contaminants, such as a benzene level greater than .5 ppm, constitutes hazardous waste. *See* **id.** § 261.24.

Because neither Torco or Gulfstream wanted the residue that was inside CBC-501, Canal Barge and TTC viewed the material as discarded, or abandoned. That material was found to be solid. Thereafter, that solid waste was tested for contaminants and discovered to have a benzene level greater than .5 ppm. Hence, Canal Barge and TTC treated the residue, or tank bottoms, as hazardous material.

Reviewing those facts, we see no error on the part of the magistrate judge in construing the discarded residue material as hazardous waste. In light of the fact that no one attempted to recover the residue, it was not clearly erroneous for the magistrate judge to believe that the residue had been abandoned and was, thus, discarded material. Although some conflicting testimony existed regarding the liquid or solid nature of the material, the magistrate judge made specific credibility determinations to conclude that the material was solid. We give due deference to those determinations. Considering that even Torco's expert testified that if the residue were found to have been solid and discarded, it had to be classified as hazardous due to its benzene level, we find no error in the magistrate judge's conclusion.

Lastly, Torco challenges the magistrate's award of damages, in particular the amount for lost profits or detention damages. It argues that Canal Barge has failed to adequately document and support its claims for lost profits and that the delays in repair should not have been included in the calculation of damages.

17

A district court's determination of damages is a factual finding that will be set aside only if clearly erroneous. *See Marine Transport Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1140 (5th Cir. 1994). "'A ship owner is entitled to damages for the loss of use of its vessel in addition to the cost of repairs of the vessel.'" *See id*. (quoting *Kim Crest, S.A. v. M.V. Sverdlovsk*, 753 F. Supp. 642, 649 (S.D. Tex. 1990)). Included in such computations are damages resulting from reasonable delays in repair time. *See Domar Ocean Transp., Ltd. v. M/V Andrew Martin*, 754 F.2d 616, 619 (5th Cir. 1985). The ship owner has the burden to prove lost profits. *See Dow Chemical Co. v. M/V Roberta Tabor,* 815 F.2d 1037, 1042 (5th Cir. 1987). To recoup damages for lost profits, "[s]omething more than the simple fact that the vessel was laid up for repairs must be shown – a market for the vessel must be shown." *See In re M/V Nicole Trahan*, 10 F.3d 1190, 1194 (5th Cir. 1994). But we do not require that lost profits be proven specifically. *See id.* at 1195. They need only be proven "with reasonable certainty." *See Domar Ocean*, 754 F.2d at 620 (quoting *The CONQUEROR*, 17 S. Ct. 510, 516 (1897)).

Here, David Lane, a Canal Barge officer, testified about the CBC-501's charter with Citgo, that the barge would have continuously hauled clean lube oil from Louisiana to Illinois, that the clean lube fleet was being used at full capacity, and that the historical profitability of the barge was $502/day. Canal Barge

18

was able to utilize other barges to fulfill the Citgo contract after the CBC-501 had to be taken in for cleaning, but Lane testified that lost profits arose from the lost "spot market" opportunities that the other barges would have serviced. The magistrate found Lane's testimony credible and awarded lost profits. After having reviewed the trial record, we conclude that the magistrate did not clearly err when it credited Lane's testimony as sufficiently supportive of a lost profits calculation. As previously noted, we give due regard to the magistrate judge's credibility determinations, and we are not left with a firm and definite conviction that a mistake has been committed.

As for the damages from the delays in the repairs, Torco makes two primary arguments: 1) Canal Barge handled the residue as hazardous material, which resulted in a much more laborious and time-consuming task; and 2) although the CBC-501 was at TTC's facility from August 6 to October 25, the actual cleaning operations took less time, and Canal Barge's other vessels were cleaned ahead of CBC-501 preventing its immediate cleaning. Because we find that the treatment of the residue as hazardous material was not error, Torco's first basis for challenging the cleanup costs is unavailing. Regarding Torco's second argument, we acknowledge that a considerable time delay occurred, but we find no error in the damages calculation because the delay is excusable. First, much of the delay resulted from Canal Barge's discussion of the sludge problem with Gulfstream. We will not punish Canal Barge

for the fact that those who were responsible for its damages were dilatory or non-responsive in their actions.  And as previously noted, some additional time had to be expended because the residue was treated as hazardous waste.  For example, TTC had to wait for the hazardous waste barrels to arrive from the supplier.  As for Torco's argument that some delay resulted from the backlog of cleaning orders at TTC, specifically Canal Barge's other barges having to be cleaned, we find it meritless.  Under Torco's logic, Canal Barge could only get lost profits for the delays if the backlog were due to ships of other companies.  But making that distinction is senseless, considering the fact that if Canal Barge had moved the CBC-501 ahead of its other barges that were ready for repair, then those other barges would have incurred lost profits, which they would have made after being fixed.  Torco's argument merely replaces one barge with another in the damages equation. Accordingly, we affirm the magistrate judge's lost profits and damages calculation.

### III. CONCLUSION

For the foregoing reasons, we conclude that the magistrate did not err in making its findings of fact and conclusions of law. Therefore, we affirm the final judgment of the magistrate judge.